**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DOWNTOWN BAKERY CORP. and Bakery and Confectionery Workers, International Union, Local 19, Respondents. No. 15306.**

United States Court of Appeals
Sixth Circuit.

April 27, 1964.

922

Argued by Gladys Kessler, N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Atty., N. L. R. B., Washington, D. C., on the brief, for petitioner.

Argued by Morton D. Barrisch and Jack G. Day, Cleveland, Ohio, Day & Berkman, Cleveland, Ohio, on the brief, for respondent Union, Bernard A. Berkman and Larry S. Gordon, Cleveland, Ohio, of counsel, for respondents.

Before McALLISTER, Senior Circuit Judge, and BOYD and WILSON, District Judges.

MARION SPEED BOYD, District Judge.

The National Labor Relations Board petitions for enforcement of an order

entered pursuant to a finding of violations of Sections 8(a) (1), (2), (3) and (5) of the National Labor Relations Act [1] by Respondent Downtown Bakery Corporation, and violation of Sections 8(b) (1) (A) and 8(b) (2) of the Act [2] by Respondent Downtown Bakery and Confectionery Workers International Union, Local 19, hereinafter referred to as BCW.

Downtown Bakery Corporation was found to have violated Sections 8(a) (5) and (1) by refusing to recognize and bargain with American Bakery and Confectionery Workers International Union, Local 219, AFL-CIO, hereinafter referred to as ABC, said refusal not being made in good faith, and additionally by unilaterally changing terms and conditions of employment of its employees. The Board also found violations by Downtown of Section 8(a) (1), (2) and (3) of the Act by the execution and maintenance of a collective bargaining agreement with BCW. The Board found in its decision and order, 139 NLRB, No. 110, that this latter conduct:

" * * * constituted (1) interference, restraint and coercion of its employees within the meaning of Section 8(a) (1) of the Act; (2) assistance and support to Respond-

[1] 29 U.S.C.A. § 158. "(a) It shall be unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the author-

ity of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

 *       *       *       *       *

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

[2] 29 U.S.C.A. § 158(b). "It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *;

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *."

ent Union in violation of Section 8(a) (2); and (3) discrimination in regard to terms and conditions of employment to encourage membership in Respondent Union and to discourage membership in ABC Local 219 in violation of Section 8(a) (3)."

Respondent Union, BCW, was found to have violated Sections 8(b) (1) (A) and 8(b) (2) of the Act by executing and maintaining the aforementioned collective bargaining agreement with Downtown. As stated by the Board, this conduct "restrained and coerced the employees, and caused Downtown to discriminate against its employees within the meaning of Section 8(a) (3)."

On April 18, 1960, the Board certified ABC as the exclusive bargaining representative of a multiemployer unit of bakery employees of four companies, including Smayda Home Bakery Co., Inc. Prior to this multi-unit certification BCW had represented Smayda employees for a number of years. On June 14, 1960, Smayda and ABC executed a separate collective bargaining agreement effective through September 30, 1961.[3] On April 24, 1961, over one year after the Board's certification of ABC, Downtown agreed to purchase all of Smayda's personal property, trade names and certain leaseholds. Shortly thereafter (May 1) a meeting of the former Smayda employees was called by the new owners of the company. Representatives of ABC were present. Carl Davis, President of Downtown, at this meeting expressed a desire to resume operations the following day and told the employees that he would try to live up to the terms and conditions of the ABC-Smayda contract. No definite agreement was reached at that time between Davis and the ABC representatives. When these representatives renewed their demands for recognition, Davis refused, contending that he was under "pressure" from another union, ostensibly the Respondent BCW. He had received on May 1 a telephone call from a representative of BCW demanding that Downtown recognize that union as representative of a majority of the employees.

On May 2, Downtown began operations, retaining all of Smayda's former employees. As production began, certain non-discriminatory unilateral changes in conditions and terms of employment were effected, including alterations in overtime pay and nighttime bonus plans. Representatives of both unions herein attempted unsuccessfully to discuss these changes with respondent employer.

During the ensuing period representatives of ABC and BCW were frequently in the Downtown plant talking to employees and seeking to talk to the employers. There is no indication of anti-union bias on the part of the Downtown employer, who seemed to maintain a neutral attitude toward the two within unions. During the period of May 1 to June 27, each union continually urged respondent employer to recognize and bargain with it. Until June 25, 1961, neither union was asked to show proof of majority status and neither of its own initiative moved to do so. On that date a representative of BCW did display to employer Carl Davis at the latter's request a number of authorization cards, dated June 12, which had been procured from a majority of Downtown employees. On June 27, 1961, Downtown recognized BCW as the bargaining representative of its employees and entered into a union security contract with it. Only after this agreement had been executed did the representatives of ABC reveal their authorization cards, which had been signed by a majority of the employees during the first week in June 1961.

The trial examiner found that the employer Downtown entertained a good faith doubt based on reasonable grounds as to which union represented a majority of its employees, and that this doubt existed at the time of the unilateral changes of working conditions and terms of employment and at the time of its re-

---

3. It is not asserted that Downtown was ever bound by the Smayda-ABC collective bargaining contract.

fusal to recognize ABC. Accordingly, he found no violations of 8(a) (5) and (1) with respect to these particular charges. This conclusion was not concurred in by the Board, which found that the refusal to recognize ABC was not made in good faith and on reasonable grounds, so that the unilateral changes and refusal to recognize were violations of those aforementioned sections of the Act. Other conclusions of the trial examiner were adopted by the Board as previously set out.

■ The Board ordered respondent Downtown to bargain collectively with ABC at the latter's request. Downtown and BCW were ordered jointly and severally to reimburse the employees [4] for money paid by them or deducted from their earnings for initiation fees, dues, etc. Allowance was also made for interest.[5] The Board's final disposition of the matter contained five cease and desist orders and six affirmative action orders directed to Downtown and three cease and desist orders and four affirmative action orders directed to BCW, Local 19.

■ Substantial evidence supports the Board's finding that when production was resumed on May 2, 1961, Downtown Bakery continued essentially the same business which theretofore had been conducted by Smayda Bakery. The methods of production and type of goods produced by the two companies were sufficiently similar to warrant the conclusion that Downtown was a "successor employer," N. L. R. B. v. Auto Ventshade, Inc., 276 F.2d 303 (C.A.5, 1960); N. L. R. B. v. McFarland, 306 F.2d 219 (C.A.10, 1962), imposing upon such successor the duty to recognize and bargain with the incumbent union. N. L. R. B. v. Auto Ventshade, Inc., supra.

■ Where as here the Board's certification of an incumbent union has been in existence for one year when a successor employer acquires the business, the union's continued majority status is presumed. This presumption binds the successor employer unless a doubt as to the union's majority is raised in good faith and on reasonable grounds. N. L. R. B. v. International Furniture Co., 212 F.2d 431 (C.A.5, 1954); The Celanese Corporation of America, 95 NLRB 664.[6] The decisive issue then is whether alleged unfair labor practices, as refusal to bargain and unilateral changes in working conditions and terms of employment, were committed under a good faith doubt based on reasonable grounds as to the incumbent union's continued majority status.

■ Before there can be a finding of good faith of the employer, there must exist some reasonable grounds for believing the union has lost its majority status since certification. Celanese Corporation of America, supra. Apart from the telephone call on May 1, 1961, by which respondent union BCW notified Downtown that it represented all the employees in the Smayda plant, the Board finds "the record is barren of evidence showing that a reasonable basis existed for believing that ABC Local 219 no longer represented a majority. * * *" Respondents, contending there is a definite additional basis, emphasize that the election by which ABC became bargaining agent for Smayda was not unanimous, their contention being that the majority of the Smayda employees voted for BCW, but their choice was overridden by the combined votes of the employees of the other three companies of the voting group.[7] Administrative Decision of the

---

4. The reimbursement order applies to employees who became members of BCW after the execution of the collective bargaining agreement of June 27, 1961.

5. Board member Rodgers dissents from the award of interest, believing this exceeds the Board's remedial authority. This has not been brought to issue on appeal, so is not within the scope of this review.

6. This case has been cited with approval by the Supreme Court in Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L. Ed. 125 (1954) and by the Board in Stoner Rubber Co., Inc., 123 NLRB 1440 (1959).

7. 366 valid votes were cast in the multi-employer unit election of December 1959, of which approximately 28 were Smayda employees. 272 votes were cast for

NLRB General Counsel, Case No. SR–2403, rendered December 11, 1962, placed the burden on the union of establishing that the company's refusal to bargain was not based on a good faith doubt of the union's continued majority status. The company in that case had withdrawn from a multiemployer association and recognition of the union had previously been based on an election of the multiemployer unit. In Zick, dba United States Molded Shapes, 141 NLRB No. 26, the Board upheld the employer's refusal to bargain, taking particular pains to note that there was no showing that the union at any time represented a majority in a separate unit of employees. From the foregoing, it may be concluded that the dissolution of the multiemployer unit of which Smayda employees composed a relatively small segment will serve as reasonable grounds for the belief that the union had lost its majority status among those employees. This conclusion is strengthened by the findings that BCW did submit demands of recognition and had been representative of the employees of Smayda for a number of years prior to the multiemployer unit election.

In the Intermediate Report, the trial examiner states that he found "nothing in the record which persuades me that Respondent Employer did not have a good faith doubt of Local 219's [ABC's] majority status of May 2, and thereafter." This conclusion was based on several important findings of fact which were apparently adopted by the Board:[8] (1) the employer informed both unions of the conflicting claims; (2) the employer was not attempting to avoid bargaining with a union as such, this attitude being evidenced by immediate recognition of two other unions which represented units of employees other than that presently under consideration; (3) there is no indication that ABC or BCW was preferred by the employer, who was reluctant to bargain with either until sufficiently persuaded that BCW did represent a majority of the employees and could effectively call a strike as threatened; (4) the reluctance to recognize either of the within unions was predicated on the employer's uncertainty as to which represented a majority.

■ The Board contends that evidence of Downtown's lack of good faith is its failure to petition the Board for a representation election, as it was privileged to do under Section 9(c) (1) (B) of the Act[9] and as suggested by ABC. This avenue of relief is open to any party affected, the unions, the employers or the employees, so that the burden of petitioning for an election is not placed solely on the employer. Though his failure to file a petition may be used as cumulative evidence of bad faith, he is not required to do so in order to demonstrate his good faith doubt. Celanese Corporation of America, supra. In its brief, the Board cites Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125, in support of this contention, as follows:

> "If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim (that the union lacks majority status) has merit."

The Board failed to recognize the qualification in the cited case which seems to

---

ABC, 92 for BCW and one for neither union.

8. In its Decision and Order, the Board adopted the "findings, conclusions, and recommendations of the trial examiner only to the extent that they are consistent with this decision." Since the Board made no findings of fact inconsistent with those enumerated, it is assumed that these findings are incorporated in the Decision and Order.

9. 29 U.S.C.A. § 159(c) (1). "Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board—
"(A) by an employee or group of employees or any individual or labor organization acting in their behalf * * *; or
"(B) by an employer, * * *."

bear directly on this issue. At page 104 of 348 U.S., at page 181 of 75 S.Ct., 99 L.Ed. 125 it is stated:

"To be sure, what we have said has special pertinence only to the period during which a second election is impossible. * * * Furthermore, the Board has ruled that one year after certification the employer can ask for an election or, if he has fair doubts about the union's continuing majority, he may refuse to bargain further with it."

It follows that failure to petition the Board for an election to determine majority status will not per se support an inference of bad faith on the part of the employer.

■ In its Decision and Order, footnote #4, the Board states that "it appears that ABC Local 219 did in fact represent a majority of Smayda's employees at the time it requested Downtown to bargain." Shortly after this finding of fact, the Board concludes as follows:

"Applying the foregoing principles to the instant case, *and also considering that Local 219 did in fact represent a majority of the employees,* as mentioned above, it is clear that Respondent Downtown had an obligation to bargain in good faith with ABC Local 219 as of May 2, 1961, unless the totality of all the circumstances clearly reveal that Respondent Downtown's refusal to recognize and bargain with ABC Local 219 was in good faith." Emphasis added.

In the opinion of this Court there is not sufficient evidence in the record to support a finding of majority status of either union on May 2, 1961, Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and if there were it is not a determinative factor on the good faith

issue. Norlee Togs, Inc., 129 NLRB No. 5 (1960); Celanese Corporation of America, supra.

■ In its briefs the Board emphasizes the fact that the respondent employer did not request ABC to prove its majority status. In Stoner Rubber Co., Inc., 123 NLRB 1440, the Board correctly notes that "proof of majority status is peculiarly within the special competence of the union." It would seem then that the burden of coming forward with proof of its alleged majority status was upon the union. The employer, Downtown, in these circumstances should not be held accountable for its failure to request of ABC proof of its claimed majority status.

■ In our opinion the substantial evidence, including valid inferences, fails to support the Board's finding that the respondent Downtown did not entertain a good faith doubt as to the majority status of ABC. Universal Camera Corporation v. N. L. R. B., supra. Therefore the Court concludes the refusal of Downtown to recognize and bargain with ABC was not a violation of Section 8(a) (5) and (1) of the Act.

■ The Board contends that respondent Downtown's unilateral changes in terms and conditions of employment of its employees was violative of Section 8(a) (5) and (1). However, its supporting authorities [10] cover only instances in which violations constituted a circumvention of the duty to negotiate. This Court having found there was no duty to negotiate with ABC, the refusal being in good faith and on reasonable grounds, it follows that the aforesaid nondiscriminatory unilateral changes will not be held to have been unfair labor practices.

■ The record presents sufficient evidence to support the conclusion of the Board that respondent Downtown had violated Sections 8(a) (1) (2) and (3) of the Act by executing and maintaining the collective bargaining agree-

10. N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); N. L. R. B. v. J. H. Allison & Co., 165 F.2d 766, 3 A.L.R.2d 990 (C.A. 6 1948), cert. denied 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369.

ment of June 27, 1961, with BCW. When the employer is presented with rival union claims which raise a substantial question of representation, the employer may either refuse to bargain with either union, Brooks v. N. L. R. B., supra, or petition the Board for an election to settle the dispute, but the employer should not bargain collectively with any union until the question of representation has been settled by the Board. Shea Chemical Corp., 121 NLRB 1027 (1953); Hill Independent Manufacturing Co., 50 NLRB 758 (1943). Sufficient evidence supports the finding of violations of 8(b) (1) (A) and 8(b) (2) of the Act by respondent union. Universal Camera Corp. v. N. L. R. B., supra.

Having sustained the Board in part only, the Court must now consider appropriate alterations of the Board's remedial orders.

The Board is given wide discretion in fashioning a remedy for violations of the Act. The means by which the effects of an unfair labor practice are to be expiated is ordinarily a matter for the Board and not the courts to determine. Virginia Electric & Power Co. v. N. L. R. B., 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). However, a remedial order based on an erroneous finding of unfair labor practices cannot stand. Inasmuch as the premise for the Board's unconditional bargaining order is the unlawful refusal to recognize ABC, and since such refusal is now found to be lawful, enforcement of that portion of the Board's order will be denied and, pursuant to section 10(e) of the Act, 29 U.S.C.A. § 160(e), the same is hereby conditioned by this Court upon ABC's winning a Board-conducted election. Downtown must withdraw and withhold all recognition from BCW as the representative of its employees until and unless it shall have been certified by the Board. Respondent Downtown, jointly and severally with respondent union BCW, shall reimburse those employees who became members of BCW after the execution of the collective bargaining agreement of June 27, 1961. Petition for enforcement of the orders not heretofore disposed of and not inconsistent with the foregoing conclusions, is hereby granted.[11]

---

11. This includes certain cease and desist orders and the requirement of posting of notices directed to Downtown Bakery Corporation and all orders directed to Respondent Bakery and Confectionery Workers International Union, Local 19.