NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SOUTHERN COACH & BODY COM-
PANY, Inc., Respondent.

No. 20744.

United States Court of   Appeals
Fifth Circuit.

Sept. 14, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Paula Omansky, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Elliott Moore, Atty., N.L.R.B., for petitioner.

M. A. Prowell, Frank A. Constangy, Constangy & Prowell, Atlanta, Ga., for respondent.

Before MAGRUDER,* JONES and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

This petition seeks enforcement of an order of the National Labor Relations Board which requires respondent to cease and desist from its refusal to bargain collectively with the International Association of Machinists, AFL-CIO, and from instituting changes in the terms and conditions of employment without first bargaining with the union. Broadly stated, the issue before this Court is whether there is substantial evidence to support enforcement of the Board's order.[1]

The respondent, Southern Coach and Body Company, Inc., is a manufacturer of custom-built truck and bus bodies. It operates two plants at Evergreen, Alabama. All of its work is performed on a contract basis according to customer specifications. The customer sends the chassis and motor to the company's plant at Evergreen along with the specifications for the body of the vehicle, and the body is then manufactured and the vehicle assembled. Because the company produces only in response to customer specifications, which are subject to sudden change, it cannot determine its employment needs for any substantial length of time in the future. The business of the company is often subject to unpredictable fluctuations wihch make sudden temporary layoffs of its employees necessary. In the period from June 1961 to July 1962, for example, the weekly employment complement varied from a high of 296 for the week of September 3, 1961, to a low of 57 for the week of January 14, 1962. The record indicates that virtually every one of the company's employees is subject to temporary layoff because of a sudden shortage of orders and that many employees had been laid off on numerous occasions in the past few years.[2]

Pursuant to a petition filed by the International Association of Machinists on May 19, 1960, an election was held on August 12, 1960. There were a number of challenged ballots, and both the company and the union filed objections to the election. While these objections were pending before the Board, the union called a strike in which 135 of the plant's approximately 215 employees participated. The company continued its operations, however, by rehiring 22 of the striking employees and replacing the remainder. On May 26, 1961, the Board resolved the election dispute in favor of the union, and it was certified as the bargaining representative of the employees.

---

* Senior Circuit Judge of the First Circuit, sitting by designation.

1. The Board's decision and order are reported at 141 NLRB No. 9.

2. The following is taken from the transcript of the hearing before the trial examiner:

"TRIAL EXAMINER: I don't know if this would be exactly the way to express it. Do you have any roster of what you would call full-time regular employees?

"THE WITNESS: Yes, sir. I assume you mean employees who are available for work?

"TRIAL EXAMINER: No. I mean men who work full time regularly.

"THE WITNESS: No, sir; because they are subject to being laid off at one time or another if we don't have any work in that department.

"TRIAL EXAMINER: Every employee in your business, then, is subject to layoff if there's no work available there for him to do?

"THE WITNESS: Yes, sir."

Nevertheless, the strike was not called off until November 19, 1961. On November 27, 1961, soon after the strike had ended, the union filed an unfair labor practice charge with the Board, alleging that the company violated sections 8(a) (1), 8(a) (3), and 8(a) (5) of the Act.[3] The Regional Office ultimately found no evidence of section 8(a) (3) violations or independent section 8(a) (1) violations in connection with the strike.

Meanwhile, the parties held their first bargaining session on June 21, 1961, at which time the union's proposed contract was discussed but rejected by representatives of the company. However, the company offered a counterproposal and negotiations commenced. Eight more meetings were held: in July, September, October, November, and December 1961, and in January, March, and May 1962. Although concessions were made by both parties, they reached no final agreement on a contract. The major areas of disagreement were wages and layoffs. The company desired to retain its previous wage policy, including automatic wage increases three and six months after initial hiring, and also its practice of maintaining no formal job classifications, thus allowing for the flexibility which the company felt was necessary to accommodate the vicissitudes of its business. The union, on the other hand, wanted increased wage rates which would be based upon some twenty job classifications. The company and the union also disagreed on the standards to be used in determining which men were to be laid off during periods of slack production. The company asserted that the criteria should be seniority and ability to perform the work, while the union insisted on a strict seniority system.

It is necessary to set forth two further incidents which occurred during the bargaining sessions, since they are material to the charges the union makes here. During the March 1962 bargaining session a dispute arose with respect to the termination date of the contract. The company took the position that the contract should expire about June 1, 1962, slightly more than one year after the date the union was certified, so that the employees could have an opportunity to decide whether they still wished to be represented by the union. The company contended that, since the strike had resulted in the replacement of a large number of the union members, it was doubtful whether the union still represented a majority of the company's employees. On the other hand, the union wanted a contract that would extend for one year from the date an agreement was reached.

The company had also been laying off and recalling employees at will, in accordance with its past practice, throughout the period during which the parties had been bargaining for a contract. At the January 1962 meeting, the union representative demanded that the company consult the union before making any further changes in the terms or conditions of employment, including any layoffs or recalls. The company representative stated that it was impossible to consult with the union each time a layoff became necessary because layoffs were usually unforeseeable.[4] At the March meeting, the union representative made similar demands, but the company continued to reject such demands as to layoffs precipitated by reduced production. Subsequently, on April 10, 1962, the company laid off two employees, Jessie Cleve Baggett and Clinton Brown, without consulting the union. Indeed, the record indicates that the company had continued to layoff and recall employees at will throughout the remainder of the bargaining period.

On February 26, 1962, the union filed an amended unfair labor practice charge against the company, alleging that it had violated sections 8(a) (1) and 8(a)

3. 29 U.S.C.A. § 158(a) (1), (3), (5).

4. The union's office was located in Montgomery, Alabama, a distance of some ninety miles from the company's plants at Evergreen.

(5) by granting unilateral wage increases to its employees without consulting the union. The company and the union entered into a Settlement Agreement with the approval of the Regional Director on March 1, 1962, which provided that the company would make no further wage increases or change the terms or conditions of employment without first notifying and consulting the union. On March 20, 1962, a second charge was filed against the company, alleging a refusal to bargain and a refusal to rehire those who participated in the strike. Although the Regional Office found no evidence of discrimination against the strikers, the General Counsel issued a consolidated complaint on May 11, 1962, based on the section 8(a) (5) charges. The complaint alleged that the company had refused to bargain in good faith, had unilaterally changed wage rates, and had laid off employees without notifying or bargaining with the union. At the hearing, the trial examiner found violations of sections 8(a) (5) and 8(a) (1) based upon the occurrences set forth in the complaint. The Board issued a cease and desist order based upon the trial examiner's findings and recommendations, with minor modifications.

In its Decision and Order the Board stated that section 8(a) (5) was violated because prior to the Settlement Agreement the company granted a number of wage increases without consulting or bargaining with the union. The company argues that these increases merely resulted from implementation of a long-standing company practice of granting automatic wage increases to new employees three and six months after they began work, and of the past company policy of paying an employee according to the type of operation he was performing at the time. There is undisputed evidence in the record that the company had adhered to both of these policies for some time prior to the certifications of the union.

■■ The rule is clearly established that the granting of a unilateral wage increase, in the absence of some extenuating circumstance such as the existence of a bona fide bargaining impasse [5] or the implementation of a new wage program identical to one previously offered to and rejected by the bargaining agent,[6] constitutes a refusal to bargain in good faith because it serves to disparage the union and frustrate its bargaining objectives. See N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); N. L. R. B. v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1948). However, the Supreme Court clearly indicated in both the Crompton-Highland and Katz cases that a mere continuation of the status quo during the bargaining period cannot constitute a disparagement of the bargaining process; there must be an actual *change* in working conditions. Therefore, as to the three-month and six-month automatic increases, there is no evidence on which to base a conclusion that section 8(a) (5) was violated.

■ An additional number of wage increases resulted from the company's established policy of paying an employee the wage rate applicable to a new operation when it was necessary that he perform that operation. In the period immediately following the institution of the strike, the company was required to promote a number of its remaining employees in order to fill the positions left vacant by the strikers. Although the company has no formal job classifications because the uncertain nature of its business often requires the sudden shifting of employees from job to job, different wage rates had been applied in the past to the various operations performed by the employees in the company's two plants. There is no indication in the record that the promotions deviated from past company policy, or that there was any motive other than economic necessity. None of the rates themselves were altered in any fashion. The Board ar-

5. See N. L. R. B. v. Tex-Tan, Inc., 5 Cir. 1963, 318 F.2d 472, 482.

6. N. L. R. B. v. Bradley Washfountain Co., 7 Cir. 1951, 192 F.2d 144.

gues that the company was required to consult the union about each of these changes because each involved an element of discretion which precluded the union from ascertaining whether there had been a deviation from past company policy. In support of this contention, the Board relies on N. L. R. B. v. Katz, supra, which held, *inter alia*, that the granting of individual merit increases without consultation with the bargaining agent constituted an 8(a) (5) violation. We feel that there is a distinction between individual merit increases and the promotions which were made in the instant case. Individual merit increases are discretionary increases in pay based upon management's assessment of the performance of an individual employee. They are not motivated by economic necessity, but are a means of rewarding favored employees. The promotions involved here, on the other hand, were necessitated by the strike, and did not involve discretionary raises in pay. Hence, we do not feel that section 8(a) (5) precludes an employer from making the necessary adjustments in his work force which were made here in the absence of some evidence that he has deviated from established company policy or has refused to bargain with respect to the standards to be used for promotion. For the above reasons, the Board's order as to the unilateral wage increases is not supported *by substantial evidence in the circum*stances presented here and should not be enforced.

▮ The Board also found that section 8(a) (5) was violated by the company's refusal to consult the union whenever reduced production necessitated that employees be laid off. It is undisputed that the company continued to make layoffs and recalls without notifying the union, even after the union representative demanded at the January and March meetings that the company refrain from continuing this practice. In the circumstances presented in the instant case, however, we do not believe that the Board was warranted in concluding that section 8(a) (5) was violated. The company never refused to bargain regarding the standards to be used in determining which employees should be laid off first in the event a layoff became necessary; in fact, discussion had centered around this topic at a number of bargaining sessions. The union had even been successful in obtaining a concession from the company on this point.[7] Furthermore, at the hearing, the following testimony was elicited from various witnesses:

"Q. When was the first occasion that Mr. Christy ever objected or brought into the negotiations this idea of having to be consulted before a layoff could be made?

"A. January 29, 1962 was the first one I can recall.

"Q. Now prior to that time, had the methods of layoff and the fact that there were being layoffs been discussed in the bargaining sessions?

"A. Yes, sir. As a matter of fact, the outcome of the election was held up until the Board ruled on the eligibility of people who were laid off at the time of the election."

\* \* \* \* \* \*

"Q. Just a moment. Did the Union negotiators ask you to consult with them on layoffs prior to the layoff?

"A. He went further than that."

\* \* \* \* \* \*

"Q. Did he ask you to discuss layoffs of employees?

"A. He asked us—he told us that it was his right, under the National Labor Relations Act, to be consulted,

---

7. At first the company had insisted that seniority "shall govern as between employees *determined by the company* to be substantially equal as to ability to perform the work, and attendance." (emphasis supplied) The company later agreed to eliminate the phrase "by the company", although no final agreement was reached on this point because the union continued to insist on a strict seniority system.

and they had to agree before we could have a layoff. And I told him I didn't agree with him. That was what the discussion was about.

"Then we got into a question—I told him we did not have to agree; that we could not operate our plant on that basis. And then he wanted to know, would we notify him in advance before we had a layoff. And I told him we could not do it; that it was physically impossible.

"Q. All right, sir.

"A. We didn't have advance notice, ourselves."

\* \* \* \* \* \*

"Q. (By Mr. Prowell) Will you tell us, was there some discussion in the meetings held in 1962, which I believe has been testified here, there were three; was there some discussion in those meetings concerning layoffs?

"A. Yes, there was.

"Q. Tell us what that was.

"A. I believe it was in January. I don't know which meeting it was, but Mr. Christy asked us to consult him and we told him that we were going to conform to the management clause in our original proposal, to continue the policy that we had had in effect already with the Company."

\* \* \* \* \* \*

"TRIAL EXAMINER: All right.

"Q. (By Mr. Prowell) Was any reason given to Mr. Christy why we would not agree about the layoff procedure he suggested?

"A. Yes. We told him that we could not agree to it because we didn't know until late in the afternoon probably that we would have no chassis to run the next day, and we would have to lay off those men without prior arrangement with the Union; but we did not refuse to discuss it with him."

In addition, although the union had demanded consultation as to any changes with respect to the bargaining unit, pay-roll periods, wages, and recalls as well, the company representative limited his objection to layoffs. In light of the extenuating circumstances described above, the fact that the company never refused to discuss its layoff policy with the union, and the absence of a suggestion that any particular layoff interfered with the rights granted to employees by the Act, we do not feel that the Board was justified in concluding that the company exhibited a lack of good faith in refusing to accede to the demands of the union representative on this issue.

In view of the fact that there is insufficient evidence that the company violated section 8(a) (5) by instituting unilateral wage increases and layoffs, we do not feel that, standing alone, the company's insistence that the duration of the contract be limited to the certification year amounts to a refusal to bargain in good faith. Although it is a general rule that the majority status of a union is presumed to exist at the end of the certification year, the courts have repeatedly asserted that an employer is justified in refusing to recognize a union after the year has ended if the employer entertains a good faith reasonable doubt that the union no longer represents a majority of the employees. See N. L. R. B. v. International Furniture Co., 5 Cir. 1954, 212 F.2d 431; N. L. R. B. v. Downtown Bakery Corp., 6 Cir. 1964, 330 F.2d 921, 925–926; cf., Skyline Homes, Inc. v. N. L. R.. B., 5 Cir. 1963, 232 F.2d 642; N. L. R. B. v. Dan River Mills, Inc., 5 Cir. 1960, 274 F.2d 381. The record indicates that most of the employees who belonged to the union and participated in the strike were not employed by the company in March 1962 when the company first registered its demands that the union contract terminate on June 1. The strike called by the union in May 1961 forced the company to replace all of its striking members. Of the 135 strikers, only 22 were rehired, and there is no allegation that any unfair labor practice occurred in connection with the rehiring or replacement of the strikers. Furthermore, in September 1962, after the hearing but

before the trial examiner had released his intermediate report, the company moved to reopen the record for the purpose of introducing into evidence the affidavit of the company's manager, which stated that he had received a petition signed by 70% of the employees in the bargaining unit asserting that they did not wish to be represented by the union. The Board denied the company's motion in the following words: "It is clear that the petition in question was received almost six months after the issue of loss of majority was raised by Respondent in its meeting with the Union on March 19, 1962. Therefore, we find that the aforesaid affidavit can be given no weight in our consideration of the instant cases." While it is true that the affidavit does not refer to the time at which the company first insisted on limiting the duration of the contract, its contents are certainly material in determining whether the company reasonably could have doubted the union's majority status, particularly if the makeup of the company's work force had not changed appreciably during the six-month period. Unfortunately, there is no evidence in the record to indicate whether the company filed a decertification petition,[8] but we do not deem such evidence essential to establish the employer's good faith reasonable doubt as to the union's majority status. See N. L. R. B. v. Downtown Bakery Corp., 6 Cir. 1964, 330 F.2d 921, 927. In the circumstances presented here, a conclusion that the company's refusal to extend the contract date standing alone constituted evidence of a lack of good faith appears unwarranted.[9]

For the foregoing reasons, the petition for enforcement is

Denied.

8. The company, however, asserts in its brief that a petition for decertification was filed on September 19, 1962, but was dismissed by the Regional Director on October 2, 1962. We can draw no inference, favorable or unfavorable, from the dismissal, since it could have resulted because of the pendency of an unfair labor practice charge or because the Regional Director found insufficient evidence to

hold a hearing on the matter. Indeed, the Board has a policy not to conduct representation elections while unfair labor practice charges are pending. See N.L.R.B. Rules & Reg. § 102.95(b).

9. See N.L.R.B. v. Yutana Barge Lines, Inc., 9 Cir. 1963, 315 F.2d 524, 529; N.L.R.B. v. Henry Heide, Inc., 2 Cir. 219 F.2d 46, 49, cert. denied, 349 U.S. 952, 75 S.Ct. 881, 99 L.Ed. 1277 (1955).