**BRIGGS PLUMBINGWARE, INC.,**
Petitioner (87–6361),
Cross–Respondent,

Glass, Molders, Pottery, Plastics & Allied Workers International Union, AFL–CIO, CLC, Petitioner (88–5041),

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
Cross–Petitioner (88–5081).

Nos. 87–6361, 88–5081, 88–5041.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 21, 1989.

Decided June 15, 1989.

Sarah E. Hall, Robert J. Mignin, Douglas A. Darch argued, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for petitioner cross-respondent.

Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., John S. Gill, Linda Dreeben, John Gill, Barbara Atkin,

Laurance Zakson argued, Washington, D.C., for respondent, cross-petitioner.

Carl S. Yaller argued, Media, for intervenor Glass, Pottery, Plastics & Allied Workers Intern.

Before KENNEDY and NELSON, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

These cases are consolidated before this court on petitions to review and set aside an order of the National Labor Relations Board ("the Board") reported at 286 NLRB, No. 121 (1986) by Briggs Plumbingware, Inc. ("Briggs") and Glass, Pottery, Plastics and Allied Workers International Union, AFL–CIO, CLC ("the Union") and on cross-application for enforcement of the order by the Board.

## I.

During October 1979, Colton–Wartsila, Inc. ("C–W") began manufacturing bathroom fixtures at a facility in Colton, California. Following a secret ballot election by C–W employees on January 27, 1982, the Board certified the Union as the exclusive bargaining representative for C–W's approximately 120 production and maintenance employees.

On June 14, 1985, Briggs, a wholly-owned subsidiary of J.P. Industries, Inc. ("JPI") and a Michigan corporation which currently operates seven bathroom fixture plants, signed a ten year lease with C–W for its Colton facility and equipment. Beginning June 25, 1985 and ending August 2, 1985, C–W terminated its workforce. In mid-July, Briggs began contacting former C–W employees by telephone to offer them employment, followed on July 18, 1985 by forty-two letters containing employment offers. Thirty-nine former C–W employees showed up for renovation work on July 29, which lasted until September 24, 1985 and involved safety changes, clean-up and maintenance, and mold production. Actual production began on September 24, 1985, when the first molds were cast, with 40 employees, almost all of whom had worked for C–W. By October 29, 1985, Briggs' production capacity reached 50% with seventy-one employees, fifty-nine of whom had worked for C–W, and filling twenty-four of twenty-seven job classifications. By May 1986, all twenty-seven job classifications were filled with a total of 105 employees. Briggs also hired eight of C–W's ten line supervisors and Paul Blalock, C–W's employee relations manager, for similar positions within Briggs.

The Union first learned of Briggs' lease of the Colton facility and of C–W's intention to cease production late in June 1985. Jesse Garcia, the representative for the International Union, contacted Blalock to express concern over the effect of the recent transaction on C–W employees. On July 2, 1985, a "feeling out" meeting was held between the Union and Briggs' management, at which little happened except that the Union was told it would be kept informed. On July 21, 1985, just after Briggs mailed the job offers to former C–W employees, Garcia met with Blalock and Daniel Schelker, Briggs' Operations Manager, expressing the Union's concern over Briggs' bad faith in making the job offers.

On July 29, 1985, Garcia again met with Blalock and Schelker, who were this time accompanied by Douglas Lalama, Director of Employee Relations for JPI. Garcia was informed that Briggs would recognize the Union if presented with union authorization cards from a majority of unit employees by July 31, when Lalama was leaving town.

Between July 29 and 31, Garcia and Benny Espinosa, a Briggs employee and the Local Union's president, collected authorization cards from employees. During this time, Briggs received reports from several employees and supervisors that the Union was threatening employees with the loss of their jobs and insurance if they did not sign the authorization cards. On the morning of July 31, Briggs instructed Garcia to stop soliciting cards during work time and stop threatening employees. Lalama instructed Schelker and Blalock not to examine any cards the Union might try to present. La-

ter the same day, Lalama refused to examine the cards Garcia produced that he claimed represented a majority of the employees. During the next week, eight employees reported dissatisfaction with the Union to their supervisors and others reported being threatened to sign authorization cards. On August 2, 1985, Jeffrey Thomas, a Briggs employee, held a meeting with fellow employees, which resulted in a list of ten employees who had refused to sign cards and twelve revocations of authorization cards. It is undisputed that Briggs management gave Thomas permission to hold the meeting during working time, instructed him on the procedure for revoking existing authorization cards, and supplied him with paper and writing implements for the meeting.

On August 7, the Briggs management formally decided not to recognize the Union. That decision was reported to Garcia at a meeting the next day, at which Briggs invited the Union to petition the Board for an election if it still wished to be recognized. Immediately following the meeting, Garcia sent a written, formal request to Briggs for recognition. On August 28, 1985, Schelker responded to Garcia's letter, reaffirming Briggs' decision not to recognize the Union based on its good faith doubt of the Union's majority status.

On September 5, 1985 the Union filed unfair labor practice charges against Briggs for its refusal to recognize and bargain with the Union. During the pendency of the charges on October 18, Teamsters Local 166 ("the Teamsters") filed an election petition with the Board. On November 26, 1985, in this case, Briggs employees, at the behest of Jeffrey Thomas, filed a petition with the Board to decertify the Union. On July 25, 1986, the Administrative Law Judge ("ALJ") issued his decision which determined Briggs was a successor employer and employed a substantial and representative complement of employees on September 24, 1985 or in the alternative on October 29, 1985. The ALJ also determined Briggs violated section 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("the Act")[1] by coercing its employees in the exercise of their rights, in an effort to obtain objective evidence of its good faith doubt of the Union's majority status and by refusing to recognize and bargain with the Union. The Board adopted the ALJ's findings of fact, conclusions of law, and order to recognize in pertinent part, concluding however, that Briggs' obligation to bargain matured October 29. From this decision and order, Briggs and the Union filed this appeal and the Board petitions for enforcement of its order. Briggs appeals the decision of the Board finding it a successor employer, concluding it violated sections 8(a)(1) and (5) of the Act for refusing to recognize and bargain with the Union, and permitting the General Counsel to amend its complaint. The Union appeals that portion of the decision concluding Briggs' bargaining obligation did not accrue until October 29, 1985 and was with the Local Union only.

## II. Successorship Determination

In *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 280–81, 92 S.Ct. 1571, 1578–79, 32 L.Ed.2d 61 (1972), the Supreme Court approved the Board's approach to determine whether a new employer is the successor to the old one. The focus in a successorship determination is on the substantial continuity in the enterprises. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987). The perspective from which the Board must conduct this analysis, "whether 'those employees who have been retained will understandably view their job situations as essentially unaltered,'" furthers the Act's policy of preserving industrial peace. *Id.* (quoting *Golden State Bottling Co. v.*

---

**1.** 29 U.S.C. §§ 158(a)(1), (5) (1977 & Supp.1986) provides:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

*NLRB*, 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973) ). The successor determination is important because of the presumption which follows: that the union with which the predecessor bargained continues to enjoy majority status with the successor's employees. *Burns*, 406 U.S. at 279, 92 S.Ct. at 1577; *Makela Welding v. NLRB*, 387 F.2d 40, 46 (6th Cir.1967). A union retains a rebuttable presumption of majority status upon the expiration of the certification year, sufficient to establish a *prima facie* case for a successor employer's continuing obligation to bargain. *See NLRB v. Downtown Bakery Corp.*, 330 F.2d 921, 925 (6th Cir.1964); *Harley Davidson Transportation Co.*, 273 N.L.R.B. 1531, 1531 (1985).

■ The Board considers a number of factors in assessing the substantial continuity of the enterprise: the degree of similarity in the nature of the businesses, the extent to which the employees of the new company are performing the same jobs they did in their old jobs under the same conditions and supervisors, and the degree of similarity between the products, the production process, and the customers. *Fall River Dyeing*, 107 S.Ct. at 2236 (citing *Burns*, 406 U.S. at 280 n. 4, 92 S.Ct. at 1578 n. 4). This primarily factual pattern is analyzed on the basis of the totality of the circumstances. *Id.*

■ Briggs contends that substantial evidence does not establish it as a successor employer, evidencing instead substantial differences between its operations and those of C–W. Briggs urges that the Board single-mindedly focused on the fact it hired a majority of its employees from the former C–W workforce, to the exclusion of evidence demonstrating the lack of continuity between the enterprises. We note, however, the Board reasonably concluded based on the totality of the circumstances, including the evidence which Briggs urges proves lack of continuity between the enterprises, that Briggs is a successor employer. The majority of Briggs employees are former C–W employees, are engaged in substantially the same jobs, and are manufacturing products for sale in the same industry. They are servicing some of the same customers, in the same plant with the same machinery, supervisors, and essentially the same production process. The unilateral changes Briggs made in pay scale and policies concerning absence, vacations, jury duty, holiday pay and shift differentials are permissible unilateral changes for a successor employer. *See Burns*, 406 U.S. at 287, 92 S.Ct. at 1582; *NLRB v. Wayne Convalescent Center, Inc.*, 465 F.2d 1039, 1042–43 (6th Cir.1972).

Briggs also relies on the hiatus between the time when C–W ceased its operations and Briggs began its operations to evidence lack of successorship. We do not find Briggs' argument compelling. Briggs began maintenance and clean-up on the very day C–W was to have vacated the building. In fact, the record shows that due to a mix-up by one of C–W's former supervisors, there was actually an overlap of at least two days during which both companies occupied the premises. Furthermore, the Supreme Court in *Fall River Dyeing*, *supra*, refused to find a seven month hiatus sufficient to sever the successor relationship. The three month hiatus Briggs claims here is insufficient evidence of discontinuity to convince us that the thrust of the remaining evidence should not prevail. *Fall River Dyeing*, 107 S.Ct. at 2237 ("[A] hiatus is only one factor in the 'substantial continuity' calculus and thus is relevant only when there are other indicia of discontinuity."). Because Briggs' operations substantially continue both C–W's workforce and enterprise, we conclude that the Board's characterization of Briggs as a successor employer should not be disturbed.

### III. Bargaining Obligation

■ In *Burns*, the Supreme Court recognized that a successor employer is obligated to recognize the bargaining representative of the predecessor's employees, who now compose a majority of the successor's workforce. 406 U.S. at 278–79, 92 S.Ct. at 1577–78. The concurrence of two events is necessary to obligate the successor employ-

er to bargain with the union: the successor's employment of a "substantial and representative complement" of the predecessor's employees and the union's demand for recognition. *Fall River Dyeing*, 107 S.Ct. at 2237–38, 2241.

The substantial and representative complement rule was adopted by the Board for "fixing the moment when the determination as to the composition of the successor's workforce is to be made." *Fall River Dyeing*, 107 S.Ct. at 2238. If at that moment a majority of the successor's employees are former employees of the predecessor, the successor's obligation to bargain with the incumbent union accrues. *Id.* The rule balances the interest in maximum employee participation in the selection of the bargaining representative with the interest in immediacy of representation. *Id.* (citing *NLRB v. Pre–Engineered Building Products, Inc.*, 603 F.2d 134, 136 and n. 1 (10th Cir.1979)). In *NLRB v. Jeffries Lithograph*, the Ninth Circuit clearly articulated five factors, cited with approval in *Fall River Dyeing, supra,* which the Board considers in determining when the employer has hired a substantial and representative complement:

> (a) whether the job classifications designated for the operation "were filled or substantially filled"; (b) whether the operation was in "normal or substantially normal production"; (c) the size of the complement on the date of normal production; (d) the time expected to elapse before a substantially larger complement would be at work; and (e) the relative certainty of the employer's expected expansion.

752 F.2d 459, 464 (1985) (quoting *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 628 (9th Cir.1983)). There is no priority among the factors; the totality of the circumstances controls. *Fall River Dyeing*, 107 S.Ct. at 2239.

Based on these factors, the ALJ determined that Briggs' bargaining obligation matured on September 24 or in the alternative, October 29. With little comment, the Board held the obligation to bargain arose on October 29, the ALJ's alternative date.

The Union, in its appeal urges Briggs' obligation to bargain arose on July 29, August 8, September 24, or October 18, but in no event as late as October 29.

 We conclude, applying the factors approved by the Supreme Court in *Fall River Dyeing, supra,* in conjunction with the timing of the Union's demand for recognition, that substantial evidence supports the Board's decision that the proper date is October 29. The Board correctly concluded Briggs' bargaining obligation had not accrued as of July 29 since the Union had not yet made an effective demand for recognition. To be effective, that demand must be clear and unequivocal. *See Al Landers Dump Truck*, 192 N.L.R.B. 207, 208 (1971). We conclude the Board correctly found that date to be August 8, the date on which Garcia sent Briggs a formal, written demand for recognition after being told the Union would not be recognized absent an election. We similarly conclude the August and September dates urged by the Union were too early, as no part of the production process had even begun until September 24. Furthermore, by September 24 only forty percent of the expected workforce was employed. Because we cannot say substantial evidence does not support October 29 as the date on which Briggs' bargaining obligation accrued, we are unwilling to disturb the judgment of the Board that October 18 is also too early. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). By October 29, twenty-four of Briggs' twenty-seven job classifications were filled and all steps of its production process were in operation. Briggs' production had reached fifty percent of that projected. As of October 29, Briggs' workforce had reached approximately sixty-eight percent of the projected workforce, with the remaining employees to be added over the next six months.

 Although the demand occurred prior to the time when a substantial and representative complement was employed, the demand was effective on October 29 under the continuing demand theory. In *Fall River Dyeing*, the Supreme Court affirmed

**1288**

the validity of the continuing demand rule in the successorship situation saying: "It makes no sense to require the union repeatedly to renew its bargaining demand in the hope of having it correspond with the 'substantial and representative complement' date, when, with little trouble, the employer can regard a previous demand as a continuing one." 107 S.Ct. at 2241 (footnote omitted); *see also NLRB v. Aquabrom, Div. of Great Lakes Chemical*, 855 F.2d 1174, 1183 (6th Cir.1988). We conclude Briggs' obligation to bargain matured on October 29.

▮ Once attached, the bargaining obligation may only be rebutted if Briggs affirmatively establishes either that at the time it refused to bargain, Briggs had a good faith doubt of the Union's continuing majority status based on objective evidence or that the Union had in fact lost its majority status. *Harley Davidson Transportation Co.*, 273 N.L.R.B. at 1531; *Terrell Machine Co.*, 173 N.L.R.B. 1480, 1480–81 (1969), *enforced sub nom. Terrell Machine Co. v. NLRB*, 427 F.2d 1088 (4th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970).

**A. Good Faith Doubt of Majority Status**

▮ Briggs has urged repeatedly that the totality of the circumstances supports a finding that it harbored a good faith doubt of the Union's majority status on or before October 29. Once a successor employer forms a good faith doubt that the union continues to represent a majority of the unit employees based on objective evidence, it is no longer bound to recognize and bargain with the union. *See, e.g., NLRB v. Pennco, Inc.*, 684 F.2d 340, 342 (6th Cir.1982); *NLRB v. Downtown Bakery Corp.*, 330 F.2d 921, 925 (6th Cir.1964). The burden of proof for the employer is merely to prove it had objective reasons for doubting the union's majority status. *Sofco, Inc.*, 268 N.L.R.B. 159, 160 (1983). Unlike the situation where the employer relies on actual loss of a union's majority status to legitimize its refusal to recognize or bargain, reliance on good faith doubt of a union's majority status depends on the employer's knowledge on or before the date the bargaining obligation accrues. *See Pennco*, 684 F.2d at 342; *NLRB v. Washington Manor, Inc.*, 519 F.2d 750, 753 (6th Cir.1975).

▮ Briggs has urged that its good faith doubt of the Union's majority status is based on the following objective evidence: statements by employees of their dissatisfaction with the Union, a list of employees who claim never to have signed the Union's authorization cards, a list of employees who revoked their prior authorization cards for the Union, the alleged coercive conduct of the Union while soliciting the authorization cards, and the filing of the Teamster's election petition. However, employee statements of dissatisfaction with a union are not deemed the equivalent of withdrawal of support for the union as the exclusive bargaining representative. *See e.g., NLRB v. Wayne Convalescent Center*, 465 F.2d 1039, 1043 (6th Cir.1972); *Triplett Corp.*, 234 N.L.R.B. 965, 986 (1978); *Bartenders Ass'n of Pocatello*, 213 N.L.R.B. 651, 652 (1974); *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486 (2d Cir. 1975). Mere disparaging remarks about a union to management may have been made to incur the employer's favor. *See NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 306 (9th Cir.1978). Here, where the statements are merely disparaging and not absolutely opposed to representation by the Union, but also involve only eight persons of an approximately forty person workforce, the evidence falls short of establishing a good faith doubt. The assertion is too tenuous to meet the objective standard for good faith doubt, and we conclude substantial evidence supports the Board's finding that Briggs did not have a good faith doubt of the Union's majority status.

▮ Neither does the Teamsters' election petition demonstrate Briggs' good faith doubt of the Union's majority status. It is undisputed that as of October 29, the date on which Briggs' bargaining obligation accrued, Briggs' only knowledge was that the petition had been filed. In order for a petition to be filed, it must be supported by a minimum of thirty percent

of the bargaining unit. Thus, the mere filing of an election petition does not constitute good faith doubt that a majority of the employees no longer wish to be represented by the Union. The Board has concluded that the filing of a decertification petition without more also fails to establish good faith doubt. *See Dresser Industries, Inc.,* 264 N.L.R.B. 1088, 1088 (1982) (citing *Massey–Ferguson, Inc.,* 184 N.L.R.B. 640, 641 (1970)); *Wabana, Inc.,* 146 N.L.R.B. 1162, 1171 (1964).

On the totality of the circumstances, there is substantial evidence in the record to support the Board's finding that Briggs has failed to prove it harbored an objectively-based good faith doubt of the Union's majority status. We hold that Briggs has failed to rebut the Union's presumption of majority status with objective evidence.

B. Actual Loss of Majority Status

Briggs has attempted at each level of its defense against the unfair labor practice charges to rebut the Union's presumption of majority representative status. "Majority representative status" is defined by the Board as a union's status when "a majority of employees in the unit wish to have the union as their representative for collective-bargaining purposes." *Celanese Corp. of America,* 95 N.L.R.B. 664, 671–72 (1951). The Act provides the traditional means of resolving an employer's doubts concerning the continuing majority status of a bargaining representative to be by the filing of an employer representation petition pursuant to section 9(c) of the Act. 29 U.S.C. § 159(c). This court has held, however, that it is not an unfair labor practice or even evidence of bad faith for an employer to fail to make such a filing. *Downtown Bakery,* 330 F.2d at 926.

 Both the ALJ and the Board in this case concluded that the Union "has been, and is, the exclusive bargaining representative of the employees in the unit...." *Briggs Plumbingware, Inc.,* 286 N.L.R.B. No. 121 (1987). Nevertheless, during the course of these proceedings, Briggs has sought to prove actual loss of the Union's majority status with evidence that twenty-

six employees "revoked" their support for the Union (Respondent's brief before the NLRB at 26–28) and that at least thirty percent and allegedly more than seventy percent of the employees signed authorization cards in support of a rival union, the Teamsters.

Even if we credit Briggs' allegation that twenty-six persons revoked their support for the Union, the evidence fails to prove that a majority of the unit no longer wished to be represented by the Union. In *Sofco, Inc.,* the Board articulated the burden of proof of an employer trying to evade its bargaining obligation as not "the burden of proving that an actual numerical majority opposes the union." 268 N.L.R.B. 159, 160 (1983). The Board noted that the employer's burden did require setting forth objective reasons for its good faith doubt of the union's majority status. *Id.* Where, as here, however, the employer cannot show good faith doubt and must rely instead on actual loss of the union's majority status, loss of an actual numerical majority or a Board election or decertification must be proved. Because Briggs employed seventy-one persons on October 29, the date on which the bargaining obligation attached, even valid revocations by twenty-six employees fail to prove a majority of employees no longer wished to be represented by the Union.

Neither was there a Board election or decertification to prove actual loss of majority status. The fact of the Board's failure to process the October 18 Teamster's election petition (and the November 26 petition for decertification, irrelevant here since we are concerned only with the Union's status on or before October 29) does not help Briggs to surmount the section 8(a)(5) charge brought by the Union. Although the processing of the election might have produced evidence of actual loss of majority status, the Board's management of the transactions was not improper. The Board has the discretion in ordering an election to decide whether it will effectuate the policies of the Act. *See American Metal Products Co.,* 139 N.L.R.B. 601, 604 (1962). The blocking charge rule provides

that a Regional Director may decline to direct an election during the pendency of unfair labor practice charges which affect the unit involved in the representation proceeding. The blocking charge rule reflects "a general policy of holding in abeyance any representation case ... where pending unfair labor practice charges filed by a party to the ... case[ ] are based upon conduct of a nature which would have a tendency to interfere with the free choice of the employees in an election, were one to be conducted...." N.L.R.B. Casehandling Manual ¶ 11730 (March 1983). The Board's Rules and Regulations permit any party to request Board review of a Regional Director's actions based on three specifically enumerated grounds: a substantial question of law or policy is raised because of the absence of or departure from Board precedent; compelling reasons exist for reconsideration of an important Board rule or policy; or the Regional Director's action was on its face arbitrary or capricious. 29 C.F.R. § 102.71(b) (1988); *see also Bishop v. NLRB*, 502 F.2d 1024, 1028–29 (5th Cir. 1974). Because neither Briggs nor the employees sought review of the Regional Director's decision to block the election petition until resolution of the unfair labor practice proceeding, Briggs cannot prove that on October 29 the Union lacked majority representative status.

▮▮▮ Briggs also argues that the filing of the rival union's election petition raised a bar to its recognition of the incumbent union. Briggs urges this court's decision in *NLRB v. Downtown Bakery, supra*, governs. In *Downtown Bakery*, the court upheld the policy of the NLRB that the employer, faced with competing demands for recognition, violated sections 8(a)(1), (2), and (3) of the Act by executing and maintaining a collective bargaining agreement with a rival union. This court held that

> [w]hen the employer is presented with rival union claims which raise a substantial question of representation, the employer may either refuse to bargain with either union, *Brooks v. NLRB, supra,* or petition the Board for an election to settle the dispute, but the employer should not bargain collectively with any union until the question of representation has been settled by the Board. *Shea Chemical Corp.,* 121 N.L.R.B. 1027 (1953).

*Downtown Bakery,* 330 F.2d at 928. The Board overruled *Shea Chemical Corp., supra,* the case on which *Downtown Bakery* was based, in *RCA Del Caribe,* 262 N.L.R.B. 963, 964–65 and n. 12 (1982), saying:

> While the filing of a valid petition may raise a doubt as to majority status, the filing, in and of itself, should not overcome the strong presumption in favor of the continuing majority status of the incumbent and should not serve to strip it of the advantages and authority it could otherwise legitimately claim.

Although we recognize the precedential effect of this court's earlier opinion we acknowledge that Congress gave the Board specific authority to carry out the purposes of the Act. *See Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 464. We conclude that the Board was entitled to change its former policy and hold that protection of continuing majority status was more important than the appearance of strict employer neutrality. *RCA Del Caribe,* 262 N.L.R.B. at 965.[2]

We conclude the Board correctly applied the law to the facts of this case and that its decision is supported by substantial evidence. Therefore, Briggs' obligation to bargain with the Union was not rebutted by proof that the Union lost its majority status. We hold that Briggs' refusal to

---

2. The Board documented well the reason for its change in policy:

> [I]t has become increasingly evident that the Board's efforts to promote employee free choice have been at a price to the stability of collective-bargaining relationships. In particular, the *Shea Chemical* adaptation of *Midwest Piping* has failed to accord incumbency the advantages which in nonrival situations

the Board has encouraged in the interest of industrial stability. The recognition of the special status of an incumbent union indicates a judgment that, having once achieved the mantle of exclusive bargaining representative, a union ought not to be deterred from its representative functions even though its majority status is under challenge.

*RCA Del Caribe,* 262 N.L.R.B. at 965.

recognize and bargain with the Union constituted a violation of section 8(a)(5) of the Act. Briggs failed to prove with clear and convincing evidence that withdrawal of recognition was appropriate based either on its good faith doubt of continuing majority status or on the Union's actual loss of majority representative status.

## IV. General Counsel's Motions to Amend the Complaint

During the course of the hearing before the ALJ, General Counsel made two motions to amend its complaint, the granting of which has engendered a strenuous complaint by Briggs. The first motion was to correct the complaint to allege the Local Union instead of the International Union as the exclusive bargaining representative of the employees. The second motion was to amend the complaint to allege that on July 29, rather than August 28, Briggs unlawfully refused to recognize and bargain with the Union. We conclude the Board properly permitted these amendments.

Section 102.17 of the Board's Rules and Regulations provides that motions to amend be permitted "upon such terms as may be deemed just." This provision is liberally construed to permit amendments during and after the hearing before the ALJ and occasionally after the case has been transferred to the Board. In all cases, the amendments must be made before the Board has issued any order. Both motions were made during the course of the initial hearing before the ALJ and were, therefore, properly before him.

 The first motion, to correct the name of the bargaining agent, was as the ALJ determined, merely a misnomer problem. Where, as here, the Union had actual notice of the Board's charges, the Union was not prejudiced by the misnomer and will not be permitted to abuse the statutory requirements for the self-serving end of having the complaint dismissed altogether. *See, e.g., Peterson Construction Co.,* 106 N.L.R.B. 850, 851 (1953); *Botany 500,* 251 N.L.R.B. 527, 530-31 (1980). Furthermore, the Union is a charging party and not the respondent in these proceedings; the equi-

ties, therefore, support the Board's decision to grant General Counsel's motion to amend.

We turn to the second motion to amend the complaint to allege July 29 rather than August 28 as the date Briggs unlawfully refused to recognize and bargain with the Union. As the party opposing the motion, Briggs has failed completely to prove it would be prejudiced if the motion were granted. On this basis, we conclude the ALJ properly granted General Counsel's second motion to amend as well.

Because the Board's findings and order in these cases are supported by substantial evidence, its petition for enforcement of the order is granted and the petitions of Briggs and the Union are denied.