# NATIONAL LABOR RELATIONS BOARD *v.* BURNS INTERNATIONAL SECURITY SERVICES, INC., ET AL.

No. 71–123.   Argued January 13, 1972—Decided May 15, 1972*

---

*Together with No. 71–198, *Burns International Security Services, Inc.* v. *National Labor Relations Board et al.,* also on certiorari to the same court.

White, J., delivered the opinion for a unanimous Court in No. 71–123, and for the Court in No. 71–198, in which Douglas, Stewart, Marshall, and Blackmun, JJ., joined. Rehnquist, J., filed an opinion concurring in No. 71–123 and dissenting in No. 71–198, in which Burger, C. J., and Brennan and Powell, JJ., joined, *post*, p. 296.

*Norton J. Come* argued the cause for the National Labor Relations Board, petitioner in No. 71–123 and respondent in No. 71–198. With him on the brief were *Solicitor General Griswold, Harry R. Sachse, Peter G. Nash,* and *Nancy M. Sherman.*

*Charles G. Bakaly, Jr.,* argued the cause for Burns International Security Services, Inc., respondent in No. 71–123 and petitioner in No. 71–198. With him on the brief was *Seymour Swerdlow.*

*Gordon A. Gregory* argued the cause and filed a brief for International Union, United Plant Guard Workers of America, et al., respondents in both cases.

Briefs of *amici curiae* were filed by *J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* for the American

Federation of Labor and Congress of Industrial Organizations, and by *Milton A. Smith* and *Jay S. Siegel* for the Chamber of Commerce of the United States.

MR. JUSTICE WHITE delivered the opinion of the Court.

Burns International Security Services, Inc. (Burns), replaced another employer, the Wackenhut Corp. (Wackenhut), which had previously provided plant protection services for the Lockheed Aircraft Service Co. (Lockheed) located at the Ontario International Airport in California. When Burns began providing security service, it employed 42 guards; 27 of them had been employed by Wackenhut. Burns refused, however, to bargain with the United Plant Guard Workers of America (UPG) which had been certified after a National Labor Relations Board (Board) election as the exclusive bargaining representative of Wackenhut's employees less than four months earlier. The issues presented in this case are whether Burns refused to bargain with a union representing a majority of employees in an appropriate unit and whether the National Labor Relations Board could order Burns to observe the terms of a collective-bargaining contract signed by the union and Wackenhut that Burns had not voluntarily assumed. Resolution turns to a great extent on the precise facts involved here.

I

The Wackenhut Corp. provided protection services at the Lockheed plant for five years before Burns took over this task. On February 28, 1967, a few months before the changeover of guard employers, a majority of the Wackenhut guards selected the union as their exclusive bargaining representative in a Board election after Wackenhut and the union had agreed that the Lockheed plant was the appropriate bargaining unit. On March 8,

the Regional Director certified the union as the exclusive bargaining representative for these employees, and, on April 29, Wackenhut and the union entered into a three-year collective-bargaining contract.

Meanwhile, since Wackenhut's one-year service agreement to provide security protection was due to expire on June 30, Lockheed had called for bids from various companies supplying these services, and both Burns and Wackenhut submitted estimates. At a pre-bid conference attended by Burns on May 15, a representative of Lockheed informed the bidders that Wackenhut's guards were represented by the union, that the union had recently won a Board election and been certified, and that there was in existence a collective-bargaining contract between Wackenhut and the union. App. 4–5, 126.[1] Lockheed then accepted Burns' bid, and on May 31 Wackenhut was notified that Burns would assume responsibility for protection services on July 1. Burns chose to retain 27 of the Wackenhut guards, and it brought in 15 of its own guards from other Burns locations.

During June, when Burns hired the 27 Wackenhut guards, it supplied them with membership cards of the American Federation of Guards (AFG), another union with which Burns had collective-bargaining contracts at other locations, and informed them that they had to become AFG members to work for Burns, that they would not receive uniforms otherwise, and that Burns "could not live with" the existing contract between Wackenhut and the union. On June 29, Burns recognized the AFG on the theory that it had obtained a card majority. On July 12, however, the UPG demanded that Burns recog-

---

[1] A Burns executive later admitted in the unfair-labor-practice proceeding that Burns was aware of the union's status, the unit certification, and the collective-bargaining contract after the May 15 meeting. App. 105.

nize it as the bargaining representative of Burns' employees at Lockheed and that Burns honor the collective-bargaining agreement between it and Wackenhut. When Burns refused, the UPG filed unfair labor practice charges, and Burns responded by challenging the appropriateness of the unit and by denying its obligation to bargain.

The Board, adopting the trial examiner's findings and conclusions, found the Lockheed plant an appropriate unit and held that Burns had violated §§ 8 (a)(2) and 8 (a)(1) of the National Labor Relations Act, 49 Stat. 452, as amended, 61 Stat. 140, 29 U. S. C. §§ 158 (a)(2), 158 (a)(1), by unlawfully recognizing and assisting the AFG, a rival of the UPG; and that it had violated §§ 8 (a)(5) and 8 (a)(1), 29 U. S. C. §§ 158 (a)(5), 158 (a)(1), by failing to recognize and bargain with the UPG and by refusing to honor the collective-bargaining agreement that had been negotiated between Wackenhut and UPG.[2]

Burns did not challenge the § 8 (a)(2) unlawful assistance finding in the Court of Appeals but sought review of the unit determination and the order to bargain and observe the pre-existing collective-bargaining contract. The Court of Appeals accepted the Board's unit determination and enforced the Board's order insofar as it

---

[2] In regard to this latter finding, the Board stated:

"The question before us thus narrows to whether the national labor policy embodied in the Act requires the successor-employer to take over and honor a collective-bargaining agreement negotiated on behalf of the employing enterprise by the predecessor. We hold that, absent unusual circumstances, the Act imposes such an obligation.

.    .    .    .    .

"We find, therefore, that Burns is bound to that contract as if it were a signatory thereto, and that its failure to maintain the contract in effect is violative of Sections 8 (d) and 8 (a)(5) of the Act."

related to the finding of unlawful assistance of a rival union and the refusal to bargain, but it held that the Board had exceeded its powers in ordering Burns to honor the contract executed by Wackenhut. Both Burns and the Board petitioned for certiorari, Burns challenging the unit determination and the bargaining order and the Board maintaining its position that Burns was bound by the Wackenhut contract, and we granted both petitions, though we declined to review the propriety of the bargaining unit, a question which was presented in No. 71–198. 404 U. S. 822 (1971).

## II

We address first Burns' alleged duty to bargain with the union, and in doing so it is well to return to the specific provisions of the Act, which courts and the Board alike are bound to observe. Section 8 (a)(5), as amended by the Labor Management Relations Act, 1947, 29 U. S. C. § 158 (a)(5), makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title." Section 159 (a) provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining . . . ." Because the Act itself imposes a duty to bargain with the representative of a majority of the employees in an appropriate unit, the initial issue before the Board was whether the charging union was such a bargaining representative.

The trial examiner first found that the unit designated by the regional director was an appropriate unit for bargaining. The unit found appropriate was defined as "[a]ll full-time and regular part-time employees of

[Burns] performing plant protection duties as determined in Section 9 (b)(3) of the [National Labor Relations] Act at Lockheed, Ontario International Airport; excluding office clerical employees, professional employees, supervisors, and all other employees as defined in the Act." This determination was affirmed by the Board, accepted by the Court of Appeals, and is not at issue here because pretermitted by our limited grant of certiorari.

The trial examiner then found, *inter alia*, that Burns "had in its employ a majority of Wackenhut's former employees," and that these employees had already expressed their choice of a bargaining representative in an election held a short time before. Burns was therefore held to have a duty to bargain, which arose when it selected as its work force the employees of the previous employer to perform the same tasks at the same place they had worked in the past.

The Board, without revision, accepted the trial examiner's findings and conclusions with respect to the duty to bargain, and we see no basis for setting them aside. In an election held but a few months before, the union had been designated bargaining agent for the employees in the unit and a majority of these employees had been hired by Burns for work in the identical unit. It is undisputed that Burns knew all the relevant facts in this regard and was aware of the certification and of the existence of a collective-bargaining contract. In these circumstances, it was not unreasonable for the Board to conclude that the union certified to represent all employees in the unit still represented a majority of the employees and that Burns could not reasonably have entertained a good-faith doubt about that fact. Burns' obligation to bargain with the union over terms and conditions of employment stemmed from its hiring of Wackenhut's employees and from the recent election and

Board certification. It has been consistently held that a mere change of employers or of ownership in the employing industry is not such an "unusual circumstance" as to affect the force of the Board's certification within the normal operative period if a majority of employees after the change of ownership or management were employed by the preceding employer. *NLRB* v. *Downtown Bakery Corp.,* 330 F. 2d 921, 925 (CA6 1964); *NLRB* v. *McFarland,* 306 F. 2d 219, 221 (CA10 1962); *NLRB* v. *Auto Ventshade, Inc.,* 276 F. 2d 303, 307 (CA5 1960); *NLRB* v. *Lunder Shoe Corp.,* 211 F. 2d 284, 286 (CA1 1954); *NLRB* v. *Armato,* 199 F. 2d 800, 803 (CA7 1952); *South Carolina Granite Co.,* 58 N. L. R. B. 1448, 1463–1464 (1944), enforced *sub nom. NLRB* v. *Blair Quarries, Inc.,* 152 F. 2d 25 (CA4 1945); *Northwest Glove Co.,* 74 N. L. R. B. 1697, 1700 (1947); *Johnson Ready Mix Co.,* 142 N. L. R. B. 437, 442 (1963).[3]

It goes without saying, of course, that Burns was not entitled to upset what it should have accepted as an established union majority by soliciting representation

---

[3] Cf. § 9 (c) (3) of the NLRA, 29 U. S. C. § 159 (c) (3), which provides that "[n]o election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held." See *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 599 n. 14 (1969).

Where an employer remains the same, a Board certification carries with it an almost conclusive presumption that the majority representative status of the union continues for a reasonable time, usually a year. See *Brooks* v. *NLRB,* 348 U. S. 96, 98–99 (1954). After this period, there is a rebuttable presumption of majority representation. *Celanese Corp. of America,* 95 N. L. R. B. 664, 672 (1951). If there is a change of employers, however, and an almost complete turnover of employees, the certification may not bar a challenge if the successor employer is not bound by the collective-bargaining contract, particularly if the new employees are represented by another union or if the old unit is ruled an accretion to another unit. Cf. *McGuire* v. *Humble Oil & Refining Co.,* 355 F. 2d 352 (CA2), cert, denied, 384 U. S. 988 (1966). See n. 5, *infra.*

cards for another union and thereby committing the unfair labor practice of which it was found guilty by the Board. That holding was not challenged here and makes it imperative that the situation be viewed as it was when Burns hired its employees for the guard unit, a majority of whom were represented by a Board-certified union. See *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 609, 610–616 (1969).

It would be a wholly different case if the Board had determined that because Burns' operational structure and practices differed from those of Wackenhut, the Lockheed bargaining unit was no longer an appropriate one.[4] Likewise, it would be different if Burns had not hired employees already represented by a union certified as a bargaining agent,[5] and the Board recognized as

---

[4] The Court of Appeals was unimpressed with the asserted differences between Burns' and Wackenhut's operations: "All of the important factors which the Board has used and the courts have approved are present in the instant case: 'continuation of the same types of product lines, departmental organization, employee identity and job functions.'. . . Both Burns and Wackenhut are nationwide organizations; both performed the identical services at the same facility; although Burns used its own supervisors, their functions and responsibilities were similar to those performed by their predecessors; and finally, and perhaps most significantly, Burns commenced performance of the contract with 27 former Wackenhut employees out of its total complement of 42." 441 F. 2d 911, 915 (1971) (citation omitted). Although the labor policies of the two companies differed somewhat, the Board's determination that the bargaining unit remained appropriate after the changeover meant that Burns would face essentially the same labor relations environment as Wackenhut: it would confront the same union representing most of the same employees in the same unit.

[5] The Board has never held that the National Labor Relations Act itself requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer. But cf. *Chemrock Corp.,* 151 N. L. R. B. 1074 (1965). However, an employer who declines to hire employees solely because

much at oral argument.[6] But where the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent there is little basis for faulting the Board's implementation of the express mandates of § 8 (a)(5) and § 9 (a) by ordering the employer to bargain with the incumbent union. This is the view of several courts of appeals and we agree with those courts. *NLRB* v. *Zayre Corp.*, 424 F. 2d 1159, 1162 (CA5 1970); *Tom-A-Hawk Transit, Inc.* v. *NLRB*, 419 F. 2d 1025, 1026–1027 (CA7 1969); *S. S. Kresge Co.* v. *NLRB*, 416 F. 2d 1225, 1234 (CA6 1969); *NLRB* v. *McFarland*, 306 F. 2d, at 220.

### III

It does not follow, however, from Burns' duty to bargain that it was bound to observe the substantive terms

they are members of a union commits a § 8 (a)(3) unfair labor practice. See *K. B. & J. Young's Super Markets, Inc.* v. *NLRB*, 377 F. 2d 463 (CA9), cert. denied, 389 U. S. 841 (1967); *NLRB* v. *New England Tank Industries, Inc.*, 302 F. 2d 273 (CA1), cert. denied, 371 U. S. 875 (1962); *Piasecki Aircraft Corp.* v. *NLRB*, 280 F. 2d 575 (CA3 1960), cert. denied, 364 U. S. 933 (1961); *Tri State Maintenance Corp.*, 167 N. L. R. B. 933 (1967), enforced with mod. *sub nom. Tri State Maintenance Corp.* v. *NLRB*, 132 U. S. App. D. C. 368, 408 F. 2d 171 (1968). Further restrictions on the successor employer's choice of employees would seem to follow from the Board's instant decision that the employer must honor the pre-existing collective-bargaining contract. See *infra*, at 288–290.

[6] "Q. But [counsel for the Union], when he argued, said that even if [Burns] hadn't taken over any [employees of Wackenhut], even if they hadn't taken over a single employee, the legal situation would be the same.

"Mr. Come [for the NLRB]. We do not go that far. We don't think that you have to go that far in——

"Q. Do you think it has to be a majority?

"Mr. Come. I wouldn't say that it has to be a majority, I think it has to be a substantial number. It has to be enough to give you a continuity of employment conditions in the bargaining unit." Tr. of Oral Arg. 64–65.

of the collective-bargaining contract the union had negotiated with Wackenhut and to which Burns had in no way agreed. Section 8 (d) of the Act expressly provides that the existence of such bargaining obligation "does not compel either party to agree to a proposal or require the making of a concession." Congress has consistently declined to interfere with free collective bargaining [7] and has preferred that device, or voluntary arbitration, to the imposition of compulsory terms as a means of avoiding or terminating labor disputes. In its report accompanying the 1935 Act, the Senate Committee on Education and Labor stated:

> "The committee wishes to dispel any possible false impression that this bill is designed to compel the making of agreements or to permit governmental supervision of their terms. It must be stressed that the duty to bargain collectively does not carry with it the duty to reach an agreement, because the essence of collective bargaining is that either party shall be free to decide whether proposals made to it are satisfactory." S. Rep. No. 573, 74th Cong., 1st Sess., 12 (1935).

This Court immediately noted this fundamental theme of the legislation: "[The Act] does not compel any agreement whatever. . . . The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements

---

[7] Two exceptions to this general reluctance to interfere with free collective bargaining are the imposition of compulsory arbitration during wartime, Exec. Order No. 9017 (1942), and, on occasion, in the railroad industry, 77 Stat. 132, 81 Stat. 122. Congress has consistently rejected compulsory arbitration even as a remedy for "national emergency" disputes, however. See Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw. U. L. Rev. 735, 742–743 (1969).

which the Act in itself does not attempt to compel."
*NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 45
(1937). See also *NLRB* v. *American National Insurance
Co.*, 343 U. S. 395, 401–402 (1952); *Teamsters Local
357* v. *NLRB*, 365 U. S. 667, 676–677 (1961).

Section 8 (d), 29 U. S. C. § 158 (d), made this policy
an express statutory mandate, and was enacted in 1947
because Congress feared that "the present Board has
gone very far, in the guise of determining whether or
not employers had bargained in good faith, in setting
itself up as the judge of what concessions an employer
must make and of the proposals and counterproposals
that he may or may not make. . . . [U]nless Congress
writes into the law guides for the Board to follow, the
Board may attempt to carry this process still further
and seek to control more and more the terms of collec-
tive bargaining agreements." H. R. Rep. No. 245, 80th
Cong., 1st Sess., 19–20 (1947).

This history was reviewed in detail and given con-
trolling effect in *H. K. Porter Co.* v. *NLRB*, 397 U. S.
99 (1970). There this Court, while agreeing that the
employer violated § 8 (a)(5) by adamantly refusing to
agree to a dues checkoff, intending thereby to frustrate
the consummation of any bargaining agreement, held that
the Board had erred in ordering the employer to agree
to such a provision:

> "[W]hile the Board does have power . . . to re-
> quire employers and employees to negotiate, it is
> without power to compel a company or a union
> to agree to any substantive contractual provision
> of a collective-bargaining agreement.
>
> .    .    .    .    .
>
> "It would be anomalous indeed to hold that while
> § 8 (d) prohibits the Board from relying on a re-
> fusal to agree as the sole evidence of bad-faith
> bargaining, the Act permits the Board to compel

agreement in that same dispute. The Board's remedial powers under § 10 of the Act are broad, but they are limited to carrying out the policies of the Act itself. One of these fundamental policies is freedom of contract." 397 U. S., at 102, 108 (citations omitted).

These considerations, evident from the explicit language and legislative history of the labor laws, underlay the Board's prior decisions, which until now have consistently held that, although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them. *Rohlik, Inc.*, 145 N. L. R. B. 1236, 1242 n. 15 (1964); *General Extrusion Co.*, 121 N. L. R. B. 1165, 1168 (1958); *Jolly Giant Lumber Co.*, 114 N. L. R. B. 413, 414 (1955); *Slater System Maryland, Inc.*, 134 N. L. R. B. 865, 866 (1961); *Matter of ILWU (Juneau Spruce)*, 82 N. L. R. B. 650, 658–659 (1949), enforced, 189 F. 2d 177 (CA9 1951), aff'd on other grounds, 342 U. S. 237 (1952). As the Court of Appeals said in this case, "In none of the previous successorship cases has the Board ever reached that result. The successor has always been held merely to have the duty of bargaining with his predecessor's union." [8]  441 F. 2d, at 915.

---

[8] When the union that has signed a collective-bargaining contract is decertified, the succeeding union certified by the Board is not bound by the prior contract, need not administer it, and may demand negotiations for a new contract, even if the terms of the old contract have not yet expired. *American Seating Co.*, 106 N. L. R. B. 250 (1953); *Farmbest, Inc.*, 154 N. L. R. B. 1421, 1453–1454 (1965), enf. with mod. *sub nom. Farmbest, Inc.* v. *NLRB*, 370 F. 2d 1015 (CA8 1967); see also *Modine Mfg. Co.* v. *International Association of Machinists*, 216 F. 2d 326 (CA6 1954). The Board has declined to overturn its "long standing" *American Seating* rule after *Burns*. *General Dynamics Corp.*, 184 N. L. R. B. No. 71 (1970).

The Board, however, has now departed from this view and argues that the same policies that mandate a continuity of bargaining obligation also require that successor employers be bound to the terms of a predecessor's collective-bargaining contract. It asserts that the stability of labor relations will be jeopardized and that employees will face uncertainty and a gap in the bargained-for terms and conditions of employment, as well as the possible loss of advantages gained by prior negotiations, unless the new employer is held to have assumed, as a matter of federal labor law, the obligations under the contract entered into by the former employer. Recognizing that under normal contract principles a party would not be bound to a contract in the absence of consent, the Board notes that in *John Wiley & Sons, Inc.* v. *Livingston,* 376 U. S. 543, 550 (1964), the Court declared that "a collective bargaining agreement is not an ordinary contract" but is, rather, an outline of the common law of a particular plant or industry. The Court held in *Wiley* that although the predecessor employer which had signed a collective-bargaining contract with the union had disappeared by merger with the successor, the union could compel the successor to arbitrate the extent to which the successor was obligated under the collective-bargaining agreement. The Board contends that the same factors that the Court emphasized in *Wiley,* the peaceful settlement of industrial conflicts and "protection [of] the employees [against] a sudden change in the employment relationship," *id.,* at 549, require that Burns be treated under the collective-bargaining contract exactly as Wackenhut would have been if it had continued protecting the Lockheed plant.

We do not find *Wiley* controlling in the circumstances here. *Wiley* arose in the context of a § 301 suit to compel arbitration, not in the context of an unfair labor practice proceeding where the Board is expressly limited by the provisions of § 8 (d). That

decision emphasized "[t]he preference of national labor policy for arbitration as a substitute for tests of strength before contending forces" and held only that the agreement to arbitrate, "construed in the context of a national labor policy," survived the merger and left to the arbitrator, subject to judicial review, the ultimate question of the extent to which, if any, the surviving company was bound by other provisions of the contract. *Id.*, at 549, 551.

*Wiley's* limited accommodation between the legislative endorsement of freedom of contract and the judicial preference for peaceful arbitral settlement of labor disputes does not warrant the Board's holding that the employer commits an unfair labor practice unless he honors the substantive terms of the pre-existing contract. The present case does not involve a § 301 suit; nor does it involve the duty to arbitrate. Rather, the claim is that Burns must be held bound by the contract executed by Wackenhut, whether Burns has agreed to it or not and even though Burns made it perfectly clear that it had no intention of assuming that contract. *Wiley* suggests no such open-ended obligation. Its narrower holding dealt with a merger occurring against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation. See N. Y. Stock Corp. Law § 90 (1951); 15 W. Fletcher, Private Corporations § 7121 (1961 rev. ed.). Here there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut and Burns. On the contrary, they were competitors for the same work, each bidding for the service contract at Lockheed. Burns purchased nothing from Wackenhut and became liable for none of its financial obligations. Burns merely hired enough of Wackenhut's employees to require it to bargain with the union as commanded by § 8 (a)(5) and § 9 (a).

But this consideration is a wholly insufficient basis for implying either in fact or in law that Burns had agreed or must be held to have agreed to honor Wackenhut's collective-bargaining contract.

We agree with the Court of Appeals that the Board failed to heed the admonitions of the *H. K. Porter* case. Preventing industrial strife is an important aim of federal labor legislation, but Congress has not chosen to make the bargaining freedom of employers and unions totally subordinate to this goal. When a bargaining impasse is reached, strikes and lockouts may occur. This bargaining freedom means both that parties need not make any concessions as a result of Government compulsion and that they are free from having contract provisions imposed upon them against their will. Here, Burns had notice of the existence of the Wackenhut collective-bargaining contract, but it did not consent to be bound by it. The source of its duty to bargain with the union is not the collective-bargaining contract but the fact that it voluntarily took over a bargaining unit that was largely intact and that had been certified within the past year. Nothing in its actions, however, indicated that Burns was assuming the obligations of the contract, and "allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *H. K. Porter Co.* v. *NLRB,* 397 U. S., at 108.

We also agree with the Court of Appeals that holding either the union or the new employer bound to the substantive terms of an old collective-bargaining contract may result in serious inequities. A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, com-

position of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital. On the other hand, a union may have made concessions to a small or failing employer that it would be unwilling to make to a large or economically successful firm. The congressional policy manifest in the Act is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities. Strife is bound to occur if the concessions that must be honored do not correspond to the relative economic strength of the parties.

The Board's position would also raise new problems, for the successor employer would be circumscribed in exactly the same way as the predecessor under the collective-bargaining contract. It would seemingly follow that employees of the predecessor would be deemed employees of the successor, dischargeable only in accordance with provisions of the contract and subject to the grievance and arbitration provisions thereof.[9] Burns would not have been free to replace Wackenhut's guards with its own except as the contract permitted. Given the continuity of employment relationship, the pre-existing

---

[9] The vast majority of collective-bargaining agreements specify the procedures to be used in choosing employees for available jobs, and approximately 92% of all such contracts place some limitations on the right to discharge. Collective Bargaining Negotiations and Contracts §§ 40:1, 60:11 (BNA 1971). Under the Board's theory, if a successor refused to hire or fired any of the predecessor's employees without going through applicable grievance procedures, it might be guilty of a § 8(a)(5) refusal to bargain. See *NLRB v. Strong*, 393 U. S. 357, 359 (1969); *NLRB v. Huttig Sash & Door Co.*, 377 F. 2d 964, 968–969 (CA8 1967).

contract's provisions with respect to wages, seniority rights, vacation privileges, pension and retirement fund benefits, job security provisions, work assignments and the like would devolve on the successor. Nor would the union commit a § 8 (b)(3) unfair labor practice if it refused to bargain for a modification of the agreement effective prior to the expiration date of the agreement.[10] A successor employer might also be deemed to have

---

[10] Section 8 (d) of the Act provides, in part:

"[W]here there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

"The duties imposed upon employers, employees, and labor organizations by paragraphs (2)-(4) of this subsection . . . shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract." 29 U. S. C. § 158 (d).

inherited its predecessor's pre-existing contractual obligations to the union that had accrued under past contracts and that had not been discharged when the business was transferred. "[A] successor may well acquire more liabilities as a result of *Burns* than appear on the face of a contract." [11]  Finally, a successor will be bound to observe the contract despite good-faith doubts about the union's majority during the time that the contract is a bar to another representation election, *Ranch-Way, Inc,* 183 N. L. R. B. No. 116 (1970).[12] For the above reasons, the Board itself has expressed doubts as to the general applicability of its *Burns* rule.[13]

---

[11] Doppelt, Successor Companies: The NLRB Limits the Options—and Raises Some Problems, 20 DePaul L. Rev. 176, 191 (1971).

[12] The Board imposes this contract-bar rule for the term of a collective bargaining of "reasonable duration," a period the Board now defines as three years. *General Cable Corp.,* 139 N. L. R. B. 1123 (1962). Also during this time, an employer cannot use doubt about a union's majority as a defense to a refusal-to-bargain charge. *Oilfield Maintenance Co.,* 142 N. L. R. B. 1384, 1387 (1963); *Hexton Furniture Co.,* 111 N. L. R. B. 342 (1955). Prior to *Burns,* the Board had held that a successor was barred by the contract of the predecessor from requesting a representation election during the term of the contract only if it had assumed the contract. *Jolly Giant Lumber Co.,* 114 N. L. R. B. 413 (1955); *General Extrusion Co.,* 121 N. L. R. B. 1165 (1958); *MV Dominator,* 162 N. L. R. B. 1514 (1967). Moreover, such assumption had to be by an express written agreement. *American Concrete Pipe of Hawaii, Inc.,* 128 N. L. R. B. 720 (1960). The Board had also permitted a non-assuming successor to raise a good-faith doubt as to the union's majority as a defense to a refusal-to-bargain charge during the term of the old contract. *Randolph Rubber Co.,* 152 N. L. R. B. 496 (1965); *Mitchell Standard Corp.,* 140 N. L. R. B. 496 (1963).

[13] *Emerald Maintenance, Inc.,* 188 N. L. R. B. No. 139 (1971). *Emerald* involved a civilian contractor who undertook to provide certain maintenance services at an Air Force base. During the preceding year, the same services had been performed by two other companies whose employees were represented by a union that had

In many cases, of course, successor employers will find it advantageous not only to recognize and bargain with the union but also to observe the pre-existing contract rather than to face uncertainty and turmoil. Also, in a variety of circumstances involving a merger, stock acquisition, reorganization, or assets purchase, the Board might properly find as a matter of fact that the successor had assumed the obligations under the old contract. Cf. *Oilfield Maintenance Co.*, 142 N. L. R. B. 1384 (1963). Such a duty does not, however, ensue as a matter of law from the mere fact than an employer is doing the same work in the same place with the same employees as his predecessor, as the Board had recognized until its decision in the instant case. See cases cited *supra*, at 284. We accordingly set aside the Board's finding of a § 8 (a)(5) unfair labor practice insofar as it rested on a conclusion that Burns was required to but did not honor the collective-bargaining contract executed by Wackenhut.

negotiated collective-bargaining agreements that had not yet expired. The employer performed the work with substantially the same employee complement as had its predecessors. The Board held that the employer had a duty to recognize and bargain with the union but could not agree with the trial examiner that the employer was bound by the provisions of the contract, emphasizing in this respect the impact of the Service Contract Act of 1965, 79 Stat. 1034. The case was considered as presenting unusual circumstances justifying an exception to the *Burns* rule; the Board noted that "[t]his case suggests the hazards of enforcing the contracts of one employer against a successor where annual rebidding normally produces annual changes in contractor identity. These circumstances might encourage less arm's-length collective bargaining whenever the employer had reason to expect that it would not be awarded the next succeeding annual service contract." An *amicus* strongly contends that the *Emerald* rule is inconsistent with *Burns* and is based on a misreading of the legislative history of the Service Contract Act of 1965. Brief for AFL–CIO as *Amicus Curiae* 23 n. 2.

## IV

It therefore follows that the Board's order requiring Burns to "give retroactive effect to all the clauses of said [Wackenhut] contract and, with interest of 6 percent, make whole its employees for any losses suffered by reason of Respondent's [Burns'] refusal to honor, adopt and enforce said contract" must be set aside.[14]   We

[14] In its entirety, the Board's order required Burns to:

"1. Cease and desist from:

"(a) Refusing to bargain collectively, upon request, with the Union as the exclusive bargaining representative of its employees in the above-described unit.

"(b) Refusing to adopt, honor and enforce its contract with the Union, as successor of Wackenhut.

"(c) Assisting or recognizing AFG as the representative of its employees for the purposes of collective bargaining, unless and until said labor organization shall have been certified as the exclusive bargaining representative of said employees in an appropriate unit.

"(d) Interfering with representation of its employees through labor organizations of their own choosing.

"(e) In any like or related manner interfering with, restraining, or coercing its employees in the exercise of their rights to join or assist the Union or otherwise engage in activities protected by the Act.

"2. Take the following affirmative action which is necessary to effectuate the policies of the Act:

"(a) Withdraw and withhold recognition from AFG until or unless it is certified as bargaining representative of Respondent's employees in an appropriate unit.

"(b) Bargain collectively, upon request, with the Union and, if any understanding is reached, embody such understanding in a signed agreement.

"(c) Honor, adopt and enforce the contract between Respondent, as successor to Wackenhut, and the Union and give retroactive effect to all the clauses of said contract and, with interest of 6 percent, make whole its employees for any losses suffered by reason of Respondent's refusal to honor, adopt and enforce said contract.

"(d) Post at its Lockheed, Ontario, California, operations copies of the notice attached hereto as 'Appendix.' Copies of said notice,

note that the regional director's charge instituting this case asserted that "[o]n or about July 1, 1967, Respondent [Burns] unilaterally changed existing wage rates, hours of employment, overtime wage rates, differentials for swing shift and graveyard shift, and other terms and conditions of employment of the employees in the appropriate unit . . . ," App. 113, and that the Board's opinion stated that "[t]he obligation to bargain imposed on a successor-employer includes the negative injunction to refrain from unilaterally changing wages and other benefits established by a prior collective-bargaining agreement even though that agreement had expired. In this respect, the successor-employer's obligations are the same as those imposed upon employers generally during the period between collective-bargaining agreements." App. 8–9. This statement by the Board is consistent with its prior and subsequent cases that hold that whether or not a successor employer is bound by its predecessor's contract, it must not institute terms and conditions of employment different from those provided in its predecessor's contract, at least without first bargaining with the employees' representative. *Overnite Transportation Co.*, 157 N. L. R. B. 1185 (1966), enforced *sub nom. Overnite Transportation Co.* v. *NLRB*, 372 F. 2d 765 (CA4), cert. denied, 389 U. S. 838 (1967); *Valleydale Packers, Inc.*, 162 N. L. R. B. 1486 (1967), enforced *sub*

to be furnished by the Regional Director for Region 31, shall after being signed by Respondent's authorized representative, be posted by it immediately upon receipt thereof and be maintained by it for a period of 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken to insure that such notices are not altered, defaced or covered by any other material.

"(e) Notify said Regional Director, in writing, within 20 days from the date of the receipt of this Recommended Order what steps Respondent has taken to comply herewith."

*nom. NLRB* v. *Valleydale Packers, Inc.,* 402 F. 2d 768
(CA5 1968); *Michaud Bus Lines, Inc.,* 171 N. L. R. B.
193 (1968); *Emerald Maintenance, Inc.,* 188 N. L. R. B.
No. 139 (1971). Thus, if Burns, without bargaining to
impasse with the union, had paid its employees on and
after July 1 at a rate lower than Wackenhut had paid
under its contract, or otherwise provided terms and con-
ditions of employment different from those provided in
the Wackenhut collective-bargaining agreement, under
the Board's view, Burns would have committed a § 8 (a)
(5) unfair labor practice and would have been subject to
an order to restore to employees what they had lost by
this so-called unilateral change. See *Overnite Trans-
portation Co., supra; Emerald Maintenance, Inc., supra.*

Although Burns had an obligation to bargain with the
union concerning wages and other conditions of employ-
ment when the union requested it to do so, this case is
not like a § 8 (a)(5) violation where an employer uni-
laterally changes a condition of employment without
consulting a bargaining representative. It is difficult to
understand how Burns could be said to have *changed*
unilaterally any pre-existing term or condition of em-
ployment without bargaining when it had no previous
relationship whatsover to the bargaining unit and, prior
to July 1, no outstanding terms and conditions of em-
ployment from which a change could be inferred. The
terms on which Burns hired employees for service after
July 1 may have differed from the terms extended by
Wackenhut and required by the collective-bargaining con-
tract, but it does not follow that Burns changed *its* terms
and conditions of employment when it specified the
initial basis on which employees were hired on July 1.

Although a successor employer is ordinarily free to set
initial terms on which it will hire the employees of a
predecessor, there will be instances in which it is per-

fectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by § 9 (a) of the Act, 29 U. S. C. § 159 (a). Here, for example, Burns' obligation to bargain with the union did not mature until it had selected its force of guards late in June. The Board quite properly found that Burns refused to bargain on July 12 when it rejected the overtures of the union. It is true that the wages it paid when it began protecting the Lockheed plant on July 1 differed from those specified in the Wackenhut collective-bargaining agreement, but there is no evidence that Burns ever unilaterally changed the terms and conditions of employment it had offered to potential employees in June after its obligation to bargain with the union became apparent. If the union had made a request to bargain after Burns had completed its hiring and if Burns had negotiated in good faith and had made offers to the union which the union rejected, Burns could have unilaterally initiated such proposals as the opening terms and conditions of employment on July 1 without committing an unfair labor practice. Cf. *NLRB* v. *Katz,* 369 U. S. 736, 745 n. 12 (1962); *NLRB* v. *Fitzgerald Mills Corp.,* 313 F. 2d 260, 272–273 (CA2) cert. denied, 375 U. S. 834 (1963); *NLRB* v. *Southern Coach & Body Co.,* 336 F. 2d 214, 217 (CA5 1964). The Board's order requiring Burns to make whole its employees for any losses suffered by reason of Burns' refusal to honor and enforce the contract, cannot therefore

be sustained on the ground that Burns unilaterally changed existing terms and conditions of employment, thereby committing an unfair labor practice which required monetary restitution in these circumstances.

*Affirmed.*

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN, and MR. JUSTICE POWELL join, concurring in No. 71–123 and dissenting in No. 71–198.

Although the Court studiously avoids using the term "successorship" in concluding that Burns did have a statutory obligation to bargain with the union, it affirms the conclusions of the Board and the Court of Appeals to that effect which were based entirely on the successorship doctrine. Because I believe that the Board and the Court of Appeals stretched that concept beyond the limits of its proper application, I would enforce neither the Board's bargaining order nor its order imposing upon Burns the terms of the contract between the union and Wackenhut. I therefore concur in No. 71–123 and dissent in No. 71–198.

The National Labor Relations Act imposes upon an employer the obligation "to . . . bargain collectively with the representatives of his employees . . . ." 29 U. S. C. § 158 (a) (5). It also defines those representatives, in § 159 (a), as "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes . . . ." The union must establish its status as a majority representative either by one of the methods discussed in *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575 (1969), or because its certification as a representative of the employees of another employer binds Burns as a "successor."

The Court concludes that because the trial examiner and the Board found the Lockheed facility to be an appropriate bargaining unit for Burns' employees, and because Burns hired a majority of Wackenhut's previous employees who had worked at that facility, Burns should have bargained with the union, even though the union never made any showing to Burns of majority representation. There is more than one difficulty with this analysis.

First, it is by no means mathematically demonstrable that the union was the choice of a majority of the 42 employees with which Burns began the performance of its contract with Lockheed. True, 27 of the 42 had been represented by the union when they were employees of Wackenhut, but there is nothing in the record before us to indicate that all 27 of these employees chose the union as their bargaining agent even at the time of negotiations with Wackenhut. There is obviously no evidence whatever that the remaining 15 employees of Burns, who had never been employed by Wackenhut, had ever expressed their views one way or the other about the union as a bargaining representative. It may be that, if asked, all would have designated the union. But they were never asked. Instead, the trial examiner concluded that because Burns was a "successor" employer to Wackenhut, it was obligated by that fact alone to bargain with the union.

The second problem with the Court's reasoning is that it relies on the Board's approval of the Lockheed plant as an appropriate unit to support its conclusion that Burns must bargain with the union. While it is true, as the Court notes, that the trial examiner and the Board found the Lockheed facility to be an appropriate bargaining unit for Burns' employees, it is equally true that the trial examiner's finding to this effect was clearly dependent upon the previous stipulation between

Wackenhut and the union.[1]  One of the reasons asserted
by Burns for declining to recognize the union was its
belief that the single Lockheed facility was not an ap-
propriate bargaining unit.  This was more than a
colorable claim.  Unlike Wackenhut, Burns had never
bargained with a union consisting of its employees in
a single job location.  One of the reasons for this dif-
ference was that Burns made a practice of transferring
employees from one job to another, on a temporary
or permanent basis.  Both Burns and Wackenhut had
numerous security guard jobsites in Southern Cali-
fornia; for administrative purposes, Wackenhut treated
each jobsite as a separate unit, while Burns treated
large numbers of them together.

The Court says in effect that the Burns employees
at Lockheed were found by the Board to be an appro-
priate unit; that Burns has not expressly preserved that
point for review here; and that Burns is therefore obli-
gated to bargain with the previously certified union.
But the major premise leading to this conclusion, the
determination of the appropriate unit, was itself estab-
lished by the Board and sustained by the Court of
Appeals solely under the doctrine of successorship.
Burns is neither required to expressly challenge the
designation of the bargaining unit, nor to prevail in
such a challenge in order to demonstrate the error in
the bargaining order.  Burns has expressly challenged
the determination that underlay both the determina-

---

[1] "While a broader unit might have been appropriate, I find a unit
of guards limited to a single facility as an appropriate unit.  Here,
the certification was pursuant to a consent election agreement."
Trial Examiner's decision, App. 22.

"Trial Examiner: I am not concerned with whether or not there
was a hearing.  The Regional Director approved of the consent elec-
tion and stipulation, and the election having taken place, I would
find that the Regional Director's action was properly conducted in
due course . . . ."  Proceedings before the NLRB, App. 68.

tion as to bargaining unit and the bargaining order—the finding of successorship.

Thus, in a situation where there was no evidence at the time as to the preference of a majority of the employees at the Lockheed facility as to a bargaining agent, and there was no independent finding that the employees at that facility were an appropriate unit as to Burns, the Board nonetheless imposed the duty to bargain. This result is sustainable, if at all, only on the theory that Burns was a "successor" to Wackenhut.[2] The imposition of successorship in this case is unusual because the successor instead of purchasing business or assets from or merging with Wackenhut was in direct competition with Wackenhut for the Lockheed contract. I believe that a careful analysis of the admittedly imprecise concept of successorship indicates that important rights of both the employee and the employer to independently order their own affairs are sacrificed needlessly by the application of that doctrine to this case.

It has been aptly observed that the doctrine of "successor" employer in the field of labor law is "shrouded in somewhat impressionist approaches."[3] In *John Wiley & Sons, Inc.* v. *Livingston*, 376 U. S. 543 (1964), we employed a form of the "successor" doctrine to impose upon an employer an obligation to arbitrate disputes under an arbitration clause in an agreement entered into between a predecessor employer and the bargaining representative of the latter's employees. The doctrine has been applied by the Board and by the courts of

---

[2] The Court's emphasis, *ante*, at 275–276, on the Board's determination that Burns committed unfair practices by aiding the AFG cannot be taken as any support for the bargaining order. It merely supports the cease-and-desist order directing Burns to stop such practices, which has not been challenged here by Burns.

[3] *International Assn. of Machinists* v. *NLRB*, 134 U. S. App. D. C. 239, 243, 414 F. 2d 1135, 1139 (1969) (Leventhal, J., concurring).

appeals to impose upon the successor employer a duty to bargain with representatives of the employees of his predecessor, *NLRB* v. *Auto Ventshade, Inc.*, 276 F. 2d 303, 304 (CA5 1960); *Makela Welding, Inc.* v. *NLRB*, 387 F. 2d 40, 46 (CA6 1967), to support a finding of unfair labor practices from a course of conduct engaged in by both the predecessor and the successor, *NLRB* v. *Blair Quarries, Inc.*, 152 F. 2d 25 (CA4 1945), and to require the successor to remedy unfair labor practices committed by a predecessor employer, *United States Pipe & Foundry Co.* v. *NLRB*, 398 F. 2d 544 (CA5 1968). The consequences of the application of the "successor" doctrine in each of these cases has been that the "successor" employer has been subjected to certain burdens or obligations to which a similarly situated employer who is not a "successor" would not be subject.

The various decisions that have applied the successor doctrine exhibit more than one train of reasoning in support of its application. There is authority for the proposition that it rests in part at least upon the need for continuity in industrial labor relations, and the concomitant avoidance of industrial strife that presumably follows from such continuity. *NLRB* v. *Colten*, 105 F. 2d 179 (CA6 1939); *Tom-A-Hawk Transit, Inc.* v. *NLRB*, 419 F. 2d 1025 (CA7 1969). On examination, however, this proposition may more accurately be described as a statement of the result of a finding of successorship, rather than a reason for making that finding.

Other cases have stated the guiding principle to be whether the "employing industry" remains essentially the same after the change in ownership. *NLRB* v. *Tempest Shirt Mfg. Co.*, 285 F. 2d 1 (CA5 1960); *NLRB* v. *Alamo White Truck Service, Inc.*, 273 F. 2d 238 (CA5 1959). Under this approach a variety of facts relating to the "employing industry" have been examined to see whether a sufficient number remain unchanged to warrant the imposition of successorship. While it cannot be

doubted that a determination as to successorship will vary with different fact situations, some general concept of the reason for the successorship doctrine is essential in order to determine the importance of the various factual combinations and permutations that may or may not call for its application.

This Court's opinion in *Wiley* makes it clear that one of the bases for a finding of successorship is the need to grant some protection to employees from a sudden transformation of their employer's business that results in the substitution of a new legal entity, not bound by the collective-bargaining contract under contract law, as the employer, but leaves intact significant elements of the employer's business. The Court said there:

> "The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship. The transition from one corporate organization to another will in most cases be eased and industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by 'the relative strength . . . of the contending forces' . . . ." 376 U. S., at 549.

But other language in *Wiley* makes it clear that the considerations favoring the continuity of existing bargaining relationships are not without their limits:

> "We do not hold that in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives. As indicated above, there may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would

make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." 376 U. S., at 551.

The conflicting implications in these portions of the opinion in *Wiley* suggest that employees are indeed entitled to a measure of protection against change in the employing entity where the new employer continues to make use of tangible or intangible assets used in carrying on the business of the first employer. They also make clear that the successorship doctrine, carried to its ultimate limits, runs counter to other equally well-established principles of labor law. Industrial peace is an important goal of the Labor Management Relations Act. But Congress has time and again refused to sacrifice free collective bargaining between representatives of the employees and the employer for a system of compulsory arbitration.[4] As the Court said in *NLRB* v. *Insurance Agents,* 361 U. S. 477, 488 (1960):

"The mainstream of cases before the Board and in the courts reviewing its orders, under the provisions fixing the duty to bargain collectively, is concerned

---

[4] "Except in isolated instances, . . . Congress and the Supreme Court have refused to compel, or even to allow, that form of governmental compulsion of economic decisions which has come to be called 'compulsory arbitration.'" Jones, Compulsion and the Consensual in Labor Arbitration, 51 Va. L. Rev. 369 (1965).

"In dealing with the problem of the direct settlement of labor disputes the committee has considered a great variety of the proposals ranging from compulsory arbitration, the establishment of fact-finding boards, creation of an over-all mediation tribunal, and the imposition of specified waiting periods. . . . [W]e do not feel warranted in recommending that any such plans become permanent legislation." S. Rep. No. 105, 80th Cong., 1st Sess., 13 (1947). See also the speech by Senator Taft, during debate on the Taft-Hartley Act, 93 Cong. Rec. 3835–3836, cited in *Bus Employees* v. *Wisconsin Board,* 340 U. S. 383, 395 n. 21 (1951).

with insuring that the parties approach the bargaining table with this attitude [good faith]. But apart from this essential standard of conduct, Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences."

And this Court has recently held that the Board itself may not compel one of the parties in the collective-bargaining process to agree to any particular proposal of the other. *H. K. Porter Co. v. NLRB,* 397 U. S. 99 (1970). Conceivably the imposition of a system of compulsory arbitration, or the granting of authority to the Board to insist that the parties at some point agree on particular terms of a potential contract, would lessen the risk of industrial strife. But Congress has plainly been unwilling to purchase industrial peace at the price of substantial curtailment of free collective bargaining by the freely chosen representatives of the employees with their employer.

There is also a natural tension between the constraints imposed on employers by the Labor Management Relations Act, and the right of those employers in competition with one another "independently to rearrange their businesses and even eliminate themselves as employers." *Wiley,* 376 U. S., at 549. An employer's ability to compete in his market is affected, of course, by the terms of whatever collective-bargaining agreement he negotiates with the representative of his employees. Aside from the direct influence on price brought about by the terms of a collective-bargaining agreement, the collective-bargaining process itself presents a certain cost factor that may affect competition between employers in the market.[5] The national commitment to collective bar-

---

[5] The General Accounting Office has recognized that bidders for a cost-plus-fee subcontract to NASA, who dealt with different

gaining embodied in the Labor Management Relations Act either requires or permits many of these constraints. But quite reasonable expectations of the employees in a particular collective-bargaining unit may be disappointed by a voluntary change in the condition of the employer that is quite incapable of being remedied by any rational application of the successorship doctrine. An employer is free to cease doing business, even though he chooses to do so wholly because of anti-union animus. *Textile Workers* v. *Darlington Mfg. Co.,* 380 U. S. 263 (1965). An employer may adamantly refuse, at the expiration of the period covered by a collective-bargaining agreement, to again consent to a particular term of the agreement that the employees regarded as significant. *NLRB* v. *American National Insurance Co.,* 343 U. S. 395 (1952). These examples of permissible employer conduct for which the Labor Management Relations Act provides no remedy, notwithstanding that the conduct results in the disappointment of legitimate expectations of employees, suggest that the successorship principle, like every other principle of law, has limits beyond which it may not be expanded.

*Wiley, supra,* speaks in terms of a change in the "ownership or corporate structure of an enterprise" as bringing into play the obligation of the successor employer to perform an obligation voluntarily undertaken by the predecessor employer. But while the principle enunciated in *Wiley* is by no means limited to the corporate merger situation present there, it cannot logically be extended to a mere naked shifting of a group of employees from one employer to another without totally disregarding the basis for the doctrine. The notion of a change in the

unions, could be evaluated by NASA on the basis of varying costs that collective bargaining itself might generate. 76 Lab. Rel. Rep. 230 (1971).

"ownership or corporate structure of an enterprise" connotes at the very least that there is continuity in the enterprise, as well as change; and that that continuity be at least in part on the employer's side of the equation, rather than only on that of the employees. If we deal with the legitimate expectations of employees that the employer who agreed to the collective-bargaining contract perform it, we can require another employing entity to perform the contract only when he has succeeded to some of the tangible or intangible assets by the use of which the employees might have expected the first employer to have performed his contract with them.

Phrased another way, the doctrine of successorship in the federal common law of labor relations accords to employees the same general protection against transfer of assets by an entity against which they have a claim as is accorded by other legal doctrines to nonlabor-related claimants against the same entity. Nonlabor-related claimants in such transfer situations may be protected not only by assumption agreements resulting from the self-interest of the contracting parties participating in a merger or sale of assets but also by state laws imposing upon the successor corporation of any merger the obligations of the merged corporation (see, *e. g.*, § 90 of the N. Y. Stock Corp. Law (1951), cited in *Wiley, supra*), and by bulk sales acts found in numerous States.[6] These latter are designed to give the nonlabor-related creditor of the predecessor entity some claim, either as a matter of contract right against the successor, or as a matter of property right to charge the assets that pass from the predecessor to the successor. The implication of *Wiley* is that the federal common law of labor relations accords the same general type and degree of protection to employees claiming under a collective-bargaining contract.

---

[6] Uniform Commercial Code §§ 6–101 to 6–111.

Cases from the courts of appeals have found succes-
sorship, consistently with these principles, where the
new employer purchases a part or all of the assets of
the predecessor employer, *NLRB* v. *Interstate 65 Corp.*,
453 F. 2d 269 (CA6 1971); where the entire business
is purchased by the new employer, *NLRB* v. *McFarland*,
306 F. 2d 219 (CA10 1962); and where there is merely
a change in the ownership interest in a partnership
that operates the employing entity, *NLRB* v. *Colten*,
105 F. 2d 179 (CA6 1939). Other courts of appeals
have, equally consistently with these principles, refused
to find successorship where there have been no con-
tractual dealings between the two employers, and all
that has taken place is a shift in employees. *Tri State
Maintenance Corp.* v. *NLRB*, 132 U. S. App. D. C. 368,
408 F. 2d 171 (1968); *International Assn. of Machinists*
v. *NLRB*, 134 U. S. App. D. C. 239, 414 F. 2d 1135
(1969).[7]

The rigid imposition of a prior-existing labor relations
environment on a new employer whose only connection
with the old employer is the hiring of some of the latter's
employees and the performance of some of the work
which was previously performed by the latter, might
well tend to produce industrial peace of a sort. But
industrial peace in such a case would be produced at a
sacrifice of the determination by the Board of the appro-
priateness of bargaining agents and of the wishes of
the majority of the employees which the Act was de-
signed to preserve. These latter principles caution us
against extending successorship, under the banner of

---

[7] A finding of successorship has been upheld, on the other hand,
by one court of appeals where there were no contractual dealings
between the two employers, and the successor employer merely
replaced the predecessor as a successful bidder for a transit fran-
chise. *Tom-A-Hawk Transit, Inc.* v. *NLRB*, 419 F. 2d 1025 (CA7
1969).

industrial peace, step by step to a point where the only connection between the two employing entities is a naked transfer of employees. Justice Holmes in *Hudson Water Co.* v. *McCarter,* 209 U. S. 349, 355 (1908), summarized the general problem this way:

> "All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached."

Burns acquired not a single asset, tangible or intangible, by negotiation or transfer from Wackenhut. It succeeded to the contractual rights and duties of the plant protection service contract with Lockheed, not by reason of Wackenhut's assignment or consent, but over Wackenhut's vigorous opposition. I think the only permissible conclusion is that Burns is not a successor to Wackenhut. Following its decision in this case, the Board concluded in *Lincoln Private Police,* 189 N. L. R. B. No. 103 (1971), that an employer of guards was not a successor, saying:

> "Respondent, moreover, has operated as an entirely new and independent business enterprise. It obtained its own operating capital, purchased new uniforms, vehicles, and equipment, and occupied different premises than Industrial. Additionally, there is no indication that there has been any carryover of supervisory personnel from Industrial to Respondent." 189 N. L. R. B., at ——.

See also *Tri State Maintenance Corp.* v. *NLRB, supra.*

To conclude that Burns was a successor to Wackenhut in this situation, with its attendant consequences under the Board's order imposing a duty to bargain with the

bargaining representative of Wackenhut's employees, would import unwarranted rigidity into labor-management relations. The fortunes of competing employers inevitably ebb and flow, and an employer who has currently gained production orders at the expense of another may well wish to hire employees away from that other. There is no reason to think that the best interests of the employees, the employers, and ultimately of the free market are not served by such movement. Yet inherent in the expanded doctrine of successorship that the Board urges in this case is the notion that somehow the "labor relations environment" comes with the new employees if the new employer has but obtained orders or business that previously belonged to the old employer. The fact that the employees in the instant case continued to perform their work at the same situs, while not irrelevant to analysis, cannot be deemed controlling. For the rigidity that would follow from the Board's application of successorship to this case would not only affect competition between Wackenhut and Burns, but would also affect Lockheed's operations. In effect, it would be saddled, as against its competitors, with the disadvantageous consequences of a collective-bargaining contract unduly favorable to Wackenhut's employees, even though Lockheed's contract with Wackenhut was set to expire at a given time. By the same token, it would be benefited, at the expense of its competitors, as a result of a "sweetheart" contract negotiated between Wackenhut and its employees. From the viewpoint of the recipient of the services, dissatisfaction with the labor relations environment may stimulate a desire for change of contractors. *E. g., Tri State Maintenance Corp.* v. *NLRB, supra;* 76 Lab. Rel. Rep. 230 (1971). Where the relation between the first employer and the second is as attenuated

as it is here, and the reasonable expectations of the employees equally attenuated, the application of the successorship doctrine is not authorized by the Labor Management Relations Act.

This is not to say that Burns would be unilaterally free to mesh into its previously recognized Los Angeles County bargaining unit a group of employees such as were involved here who already have designated a collective-bargaining representative in their previous employment. Burns' actions in this regard would be subject to the commands of the Labor Management Relations Act, and to the regulation of the Board under proper application of governing principles. The situation resulting from the addition of a new element of the component work force of an employer has been dealt with by the Board in numerous cases, and various factors are weighed in order to determine whether the new workforce component should be itself a separate bargaining unit, or whether the employees in this component shall be "accreted" to the bargaining unit already in existence. See, e. g., NLRB v. Food Employers Council, Inc., 399 F. 2d 501 (CA9 1968); Northwest Galvanizing Co., 168 N. L. R. B. 26 (1967). Had the Board made the appropriate factual inquiry and determinations required by the Act, such inquiry might have justified the conclusion that Burns was obligated to recognize and bargain with the union as a representative of its employees at the Lockheed facility.

But the Board, instead of applying this type of analysis to the union's complaints here, concluded that because Burns was a "successor" it was absolutely bound to the mold that had been fashioned by Wackenhut and its employees at Lockheed. Burns was thereby precluded from challenging the designation of Lockheed as an appropriate bargaining unit for a year after the original certification. 61 Stat. 144, 29 U. S. C. § 159 (c)(3).

I am unwilling to follow the Board this far down the successorship road, since I believe to do so would substantially undercut the principle of free choice of bargaining representatives by the employees and designation of the appropriate bargaining unit by the Board that are guaranteed by the Act.