**Robert C. WELSCH, Plaintiff,**

v.

**EMPIRE PLASTICS, INC., Defendant.**

**and**

**Walter M. Brenneman, et al., Plaintiff,**

v.

**Empire Plastics, Inc., Defendant.**

**Nos. 5:97CV1520, 4:98CV0391.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 8, 1999.

---

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

On June 3, 1997, Plaintiff, Robert Welsch filed the above captioned action against Defendant Empire Plastics, Inc. ("Empire") alleging violations of the Age Discrimination in Employment Act ("ADEA"), Ohio Rev.Code § 4112.99, the Employee Retirement and Income Security Act ("ERISA"), and public policy. (Counts I–IV, respectively). On February 13, 1998, Plaintiffs, Walter M. Brenneman, Gordon Conley, Harold Meeks, David T. Sweitzer, Brent Underwood, Ted Jones, Clare Taylor, Byron E. Robinson, Steve A. Myers, and James Wolff also filed an action against Empire seeking the same relief as Plaintiff Welsch. Subsequently, Plaintiffs filed, and the Court granted a Motion to Consolidate both actions.[1] (Dkt. No. 8 in Case No. 4:98CV391).

1. Plaintiffs of both actions are represented by the same counsel, Atty. Brian J. Zimmerman.

On June 18, 1998, the Court entered a Memorandum Opinion and Order dismissing Counts I, II, and IV pursuant to FED. R.CIV.P. 12(b)(6). (Dkt. No. 26 in Case No. 5:97CV1520). Therefore, the only matter still pending before the Court is Count III, the ERISA retaliation claim.

On October 15, 1998, both Empire and Plaintiffs filed their respective Motions for Summary Judgment. (Dkt. Nos. 30 of Case No. 5:97CV1520 & 37 of 4:98CV391). On October 27, 1998, Plaintiffs filed a Response. On October 29, 1998, Empire filed a Response. For the following reasons, Plaintiffs' motions are **DENIED,** and Empire's motion is **GRANTED.**

## FACTS

The following facts are not in dispute. GenCorp owned and operated a plastics plant in Newcomerstown, Ohio where the production and maintenance employees were represented by Local No. 496 of the United Steelworkers of America ("Union"). GenCorp and Union had negotiated a collective bargaining agreement with a term October 5, 1994 – February 5, 1998. In their 1994 labor negotiations, GenCorp and Union created an "Hourly Retiree Medical and Prescription Drug Plan Sideletter for Future Retirees" which detailed the conditions under which health coverage would be continued for workers retiring after October 5, 1994.

In the Fall of 1995, GenCorp opened discussions with Empire for the sale of the Newcomerstown plant's assets. (Armstrong Aff.; First Aff.). Empire informed GenCorp that it would be willing to assume the GenCorp/Union collective bargaining agreement, and would also implement a defined benefit pension plan that would mirror the GenCorp/Union pension plan. (Armstrong Aff.; First Aff.). However, Empire refused to adopt the GenCorp/Union "Hourly Retiree Medical and Prescription Drug Plan Sideletter for Future Retirees." (Armstrong Aff.; First Aff.). Empire indicated that it would cease discussions of the purchase of the Newcomerstown plant unless GenCorp could convince the Union "to back off of the medical benefits negotiated in October 1994 for future retiring employees." (Armstrong Aff.).

Thereafter, GenCorp entered into mid-contract discussions with the Union. GenCorp negotiated a deal with the Union that created a window of opportunity for 39 of the plant's most senior hourly employees to preserve their GenCorp/Union retiree medical coverages if they retired during the term of the labor agreement—i.e. before February 5, 1998. (Armstrong Aff.; First Aff.). This window of opportunity was memorialized in a November 29, 1995 document entitled "USWA NOVATION AGREEMENT" which was signed by GenCorp, Empire, and the Union. The 39 employees for whom the retiree medical benefits opportunity was created, were free to continue their employment with Empire after February 5, 1998, but would have to assume the risk that their Union would be able to preserve retiree medical coverage in the labor discussions that would inevitably follow the expiration of the labor pact. (First Aff.).

To ensure former GenCorp employees would not be detrimentally affected in their pensions because of the sale of the Newcomerstown plant, and to also guarantee they not receive an undue benefit, Empire agreed to create its own independent pension plan to mirror GenCorp's, and to credit employees with their accrued GenCorp service for Empire eligibility, vesting, and benefit purposes. (Novation Agreement, § 3.1). GenCorp, in turn, agreed to keep intact, but freeze, its Newcomerstown pension plan. When the employees chose to retire from Empire, Defendant would reduce the actual benefits it paid out by the amount of pension paid out by GenCorp. Under this arrangement, retiring Newcomerstown employees would receive one check from GenCorp, and a separate pension check from Empire.

However, medical benefits for future retiring employees was handled much differently under the Novation Agreement. Since only 39 employees were eligible for

this temporary window of opportunity for such benefits, GenCorp agreed to simply keep in place its Newcomerstown "Hourly Retiree Medical and Prescription Drug Plan Sideletter for Future Retirees" until February 5, 1998. (Novation Agreement, § 3.3). This section of the agreement made it perfectly clear that the Newcomerstown employees had to terminate their Empire employment in order to qualify for retiree medical benefits. (Novation Agreement, § 3.3). For each employee who met the pre-conditions for retiree medical and left their positions, Empire was further indebted to GenCorp for approximately $50,000.00 (Dunn Aff.)

The transition from GenCorp to Empire had no discernible effect on the wages, hours, and terms and conditions of employment for the workforce. On March 26, 1996, Empire's President, William Dunn posted the following notice at the plant:

> Per a letter of clarification from our attorneys at Wessels and Pautsch in Chicago, the decision has been made that Empire plastics employees who choose to begin drawing their pension from GenCorp will terminate their employment with Empire Plastics. This was agreed to during the novation agreement signed by all parties involved.
>
> Employees who wish to terminate their employment with Empire Plastics and begin drawing their pension from GenCorp should request the proper forms from Kathy McNutt who will coordinate their pension between GenCorp and Empire Plastics.
>
> GenCorp has been advised to notify us of any employees who contact them directly so the proper paperwork can be processed.
>
> /s/ William Dunn
>
> cc: D. First

After this posting, Empire's Human Resources Manager, Ms. Kathy McNutt con-

fronted Plaintiffs Jones and Taylor who admitted that they had just started drawing on their GenCorp pensions. (Jones Dep. pp. 8–9; Taylor Dep. pp. 8–9). Empire's attorneys wrote to both employees and advised them that they had ten days to decide whether they wished to continue to draw their GenCorp pensions, and thus leave Empire's employment, or alternatively, continue working for Empire. Both Jones and Taylor elected to repay the amounts they had withdrawn from their GenCorp pension accounts, and continue in their Empire employment.

On July 25, 1996, McNutt learned that a third Empire employee, Plaintiff Welsch, had been drawing his pension benefits from GenCorp since February 1996. (Welsch Dep. pp. 14–15). Despite knowing of the Jones/Taylor incidents, Welsch continued to draw his GenCorp pension. That same day, he was terminated by Empire.

After Welsch's termination, the remaining Plaintiffs continued to work for Empire for approximately seventeen months without experiencing any change in their wages, hours, or terms and conditions of employment. However, within days of February 5, 1998—the expiration date of the window of opportunity which guaranteed employees of receiving retiree medical coverages—each of the remaining Plaintiffs tendered paperwork for their combined GenCorp/Empire retirements.[2]

### STANDARD OF REVIEW

FED.R.CIV.P. 56(c) governs summary judgment and provides, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

2. On February 5, 1998, Plaintiff Jones entered into an agreement with Empire which extended his opportunity for locking in retiree medical benefits until January 2000. Despite hav-

ing extended his opportunity, Jones elected to retire from Empire and began drawing his GenCorp and Empire pension benefits.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the evidence submitted must be viewed in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

"The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial." *Morales v. American Honda Motor Co., Inc.*, 71 F.3d 531, 535 (1995). If the moving party meets this burden, then the non-moving party must present additional evidence beyond the pleadings. *Id.* The non-moving party must present more than a scintilla of evidence in support of his or her position. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be granted unless there is sufficient evidence favoring the non-moving party for a judge or jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. 2505.

## ANALYSIS

### A. ERISA Retaliation

Section 510 of the 1974 Employee Retirement Income Security Act ("ERISA") provides, in pertinent part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. . . .

29 U.S.C. § 1140.

This statute requires that Plaintiffs demonstrate that Empire had a specific intent to violate ERISA. See, e.g., *Humphreys v. Bellaire Corp.*, 966 F.2d 1037 (6th Cir.1992). In analyzing the requisite "specific intent" of ERISA cases, the Sixth Circuit has adopted the Burdine burden-shifting scheme that is commonly used in reviewing discrimination claims under Title VII of the Civil Rights Act of 1964. *Id.* at 1043. The *Humphreys* Court identified the prima facie elements of § 1140 as follows:

When applying this statute, most courts have held that it is appropriate to employ a Burdine, burden-shifting approach if there is no direct evidence of the employer's motivation. [Citations omitted]. We shall follow that same approach. Thus, to avoid summary judgment on a section 1140 claim, a plaintiff must show the existence of a genuine issue of material fact that there was: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled."

*Id.* (citing, *Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3d Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987)).

If Plaintiffs prove a prima facie case as set forth above, it is Empire's burden to introduce admissible evidence of a legitimate, non-discriminatory reason for its challenged action. *See, Humphreys*, 966 F.2d at 1043. If Empire successfully asserts a legitimate reason for its actions, then the presumption of wrongful action drops from the case, and Plaintiffs must either prove that the interference with their retiree medical benefits or pension benefits was a motivating factor in Empire's actions or prove that Empire's proffered reason is not worthy of credence. *Id.*

As an initial matter, we must first determine whether Plaintiffs have set forth a prima facie case of ERISA retaliation. In order to satisfy the first prong of this inquiry, Plaintiffs must demonstrate that Empire engaged in prohibited conduct. Plaintiffs allege that Empire terminated and/or constructively terminated Plaintiffs

for exercising their rights (1) to secure their retiree medical benefits and (2) to collect their pension benefits from their former employer, GenCorp while continuing to work for Empire. These allegations will be discussed in turn.

### 1. Retiree Medical Benefits[3]

■■■■ It is settled law that a successor corporation has an obligation to bargain with the union that coexisted with the predecessor corporation. *NLRB v. Burns,* 406 U.S. 272, 294, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Despite this obligation, a successor corporation is "free to set initial terms on which it will hire the employees of the predecessor". *Id.* Further, the successor is not bound by the substantive provisions of the predecessor's collective bargaining agreement. *Id.* at 284, 92 S.Ct. 1571. Therefore, Empire had a duty to bargain with the Union, however, Empire could negotiate its own terms (i.e. the Novation Agreement) rather than be bound by GenCorp's collective bargaining agreement with the Union.

The Novation Agreement expressly deleted GenCorp's retiree medical benefits program (Sideletter for Future Retirees) and substituted in its place the following proviso that eligible employees terminate their Empire Plastics employment prior to February 5, 1998, in order to secure retirement medical benefits:

> *Post–Closing Retirees:* The Sideletter hereby is deleted from the P & I Contract. An Hourly Employee whose name is listed on Exhibit B hereto ... will be eligible to participate in the Retiree Health Care Plan if: (a) with respect to those Employees listed on Exhibit B with an Eligibility Date next to his or her name, he or she is continuously employed by Empire from the Effective Time until such date and, (b) *with respect to all Employees listed on Exhibit B, his or her employment by Em-*

*pire terminates prior to February 5, 1998* and (c) *at the time of such termination of employment he or she irrevocably applies for and begins receiving benefits under the GenCorp Pension Plan.* Any such participation will be on and subject to all of the terms and conditions contained in the Sideletter and in the Retiree Health Care Plan. Empire will not be or become a party to the Sideletter or Retiree Health Care Plan and will have no obligation under the Sideletter or Retiree Health Care Plan. All participation in the Retiree Health Care Plan pursuant to the Sideletter shall automatically terminate upon the expiration of the Sideletter on February 5, 1998; provided that any Sideletter Employee participating in the Retiree Health Care Plan at the time of such expiration shall automatically upon such expiration commence participation in the Retiree Health Care Plan pursuant to the Memorandum of Agreement, subject to all of the terms of the Retiree Health Care Plan and the Memorandum of Agreement.

Section 3.3, Novation Agreement.

■■■■ In fact, all Plaintiffs (except for Welsch) admitted in their depositions that they quit their employment with Empire solely because they did not want to risk losing their unvested retiree medical benefits. (Underwood Dep. 12; Myers Dep. 10–11; Jones Dep. 17–19, 21; Meeks Dep. 14; Robinson Dep. 10; Conley Dep. 11; Wolff Dep. 12; Taylor Dep. 13; Sweitzer Dep. 9; Brenneman Dep. 14–15). Retiree medical benefits are "welfare benefits" within ERISA. *See,* 29 U.S.C. § 1002(1). Welfare plans are specifically exempted from vesting requirements to which pension plans are subject. *See,* 29 U.S.C. § 1051(1). "Therefore, employers 'are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.'" [4] *Sprague v. Gener-*

---

**3.** This section is not applicable to Plaintiff Welsch as he was terminated for beginning to draw his GenCorp pension benefits while continuing to work for Empire. This section only deals with the remaining ten Plaintiffs.

**4.** Plaintiffs do not dispute that the retiree medical benefits were never "vested with GenCorp".

*al Motors Corp.,* 133 F.3d 388, 400 (6th Cir.1998) (en banc) (*quoting, Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)).

In the instant case, Plaintiffs (except Welsch) fail to properly demonstrate that they were constructively discharged from Empire. Plaintiffs made an informed choice to retire before February 5, 1998 in order to secure retiree medical benefits. They have not shown that their work condition were so intolerable that they were forced to retire.

In *Connors v. Chrysler Financial Corp.,* the Third Circuit recently dealt with a similar case to the one at bar. 160 F.3d 971 (1998). In *Connors,* an employee retired after his employer, Chrysler Financial Corp. ("CFI") was purchased by Nations Bank and the employees were informed that upon becoming employees of the purchaser, "they would no longer be eligible to participate in any CFI benefit program, including the CFI retirement program." 160 F.3d at 973. Connors was specifically informed that if he wanted to retire as a CFI employee, he had to elect to do so before the purchase closing. *Id.*

Because Connors felt that his benefits, including retirement benefits would be significantly less as an employee of Nations Credit, a division of Nations Bank, Connors retired rather than opting to retain employment with the purchaser. *Id.* The Third Circuit rejected his claim that he had been constructively terminated as a result of the substantial changes that would have been made to his retirement benefits:

> Connors argues that such unpleasant and difficult conditions arose when he was forced to choose between retirement from CFI or an uncertain future at Nations Credit. Connors was given the choice of retiring as a CFI employee with all the attendant CFI retirement benefits or going to work as an employee of Nations Credit with Nations Credit benefits. Despite the claim in his resignation letter that his retirement was

"involuntary." it is apparent from the record as a whole that Connors retired from CFI only after making an informed decisions based on economic realities. . . .

> The facts of this case are more similar to *Gray v. York Newspapers, Inc.,* 957 F.2d 1070 (3d Cir.1992), in which one of the plaintiffs brought a constructive claim because their employer created a financially attractive early retirement program. *See, Id.* at 1080. The Court found that the plaintiff had not established that the defendant "knowingly permitted" intolerable conditions such that a reasonable person would feel compelled to resign. *Id.* at 1082. Rather, the Court found that, like Connors, the plaintiff had "deliberated her options carefully, and elected an early retirement package." Id. at 1082–83. Like Connors, Gray was not fleeing from a stick, she was reaching for a carrot. Here, Connors weighed his options and concluded that working for Nations Credit and participating in its inferior benefit program were not reasonable financial alternatives to retirement from CFI.

*Connors,* 160 F.3d at 974–75.

Similarly, in the case at hand, all Plaintiffs retired from Empire because they preferred the security of "locking-in" their retiree medical benefits as opposed to the uncertainty what the collective bargaining negotiations between Empire and the Union would bring. Under no circumstances have Plaintiffs suffered an adverse employment action which is actionable under § 510 of ERISA. Accordingly, Plaintiffs have failed to show that Empire's creation of a window of opportunity in which certain eligible employees could retire and preserve their retiree medical benefits constitutes engaging in prohibited conduct under ERISA.

### 2. Pension Benefits

■ Empire contends that Plaintiffs had no vested right to receive pension

benefits 11 until they reached normal retirement age of 65. Defendant's argument relies heavily on *Whisman v. Robbins,* 55 F.3d 1140 (6th Cir.1995), wherein the Sixth Circuit held that an employer's suspension of pension payments when the employee became re-employed by a different employer was not "arbitrary and capricious". *Id.* at 1143.

In *Whisman,* the plaintiff had accrued enough service with his employer to qualify for a "30–And–Out" Teamsters Pension which he began drawing in February 1986 at the age of 49. *Id.* In November 1986, the plaintiff began working as a mailman for the United States Postal Service. *Id.* His Teamster's pension was suspended since he was re-employed in the same business. The Sixth Circuit held that a pension plan "may suspend otherwise accrued pension benefits: (1) when a participant retires prior to normal retirement age and then begins other employment ... and when (2) a participant has reached normal retirement age and takes another job where he works forty or more hours in a month and his re-employment is in the same industry ..." *Id.* at 1145–46.

Plaintiffs argue that Empire's reliance on *Whisman* is misplaced due to the fact that the "GenCorp Pension Plan did not provide for a suspension of benefits when employees became re-employed." (Pl. Opp.Br. at 10). Although this statement *may* be true if Plaintiffs had obtained employment elsewhere, it is not applicable in the instant case. The GenCorp Agreement For Pension, Service Award, Insurance and Supplemental Workers' Compensation Benefits ("P & I Contract") states, "If a Pensioner is subsequently re-employed *by the Company,* he will forfeit his pension payment for any calendar month during which he receives wages from the company for 8 or more days during such month." Section II(7), paragraph (j) (emphasis added).

Moreover, in the Novation Agreement, Empire substituted itself in the place of GenCorp for purposes of the existing collective bargaining agreement and the P & I Contract. Section 2.1 of the Novation Agreement states as follows:

> *Substitution:* As of the Effective Time, GenCorp will cease to be a party to and *Empire will replace GenCorp as, and will become, the sole employer-party under the Union Contract and the P & I Contract,* as herein modified and amended, and thereupon, all of GenCorp's obligations under the Union Contract and the P & I Contract will terminate, finally and irrevocably.

(emphasis added). Thus, pursuant to the language of the original P & I Contract and the Novation Agreement, Empire is now "the Company" referred to in Section II(7), paragraph (j) of the P & I Contract. Accordingly, employees drawing on their GenCorp pension would be considered re-employed by the Company if they begin working for Empire and therefore, would forfeit their pension payments.

It is quite evident from the record that Welsch and the other Plaintiffs cannot collect both their pension benefits from GenCorp and a salary from Empire. Empire's Pension Plan recognized service by all GenCorp employees including their eligibility, vesting and benefit accrual. Plainly stated, with the exception of retiree medical benefits, GenCorp employees "did not skip a beat" or lose anything with respect to wages, seniority, or pension accrual after Empire purchased the Newcomerstown plant. Thus, when Plaintiffs attempted to retire from GenCorp, they were in reality retiring from Empire.

Accordingly, Plaintiffs have failed to demonstrate that Empire engaged in any prohibited conduct under ERISA and thus, they have not set forth a prima facie case of ERISA retaliation.

## CONCLUSION

As Plaintiffs have failed to establish a prima facie case of ERISA retaliation, the Court need not discuss Empire's argument that Plaintiff Jones waived his right to sue Empire. The Novation Agreement clearly prohibits employees from securing their

retiree medical benefits and continuing their employment with Empire. Furthermore, Empire has substituted itself "in the shoes" of GenCorp thereby prohibiting employees from retiring from only GenCorp and continuing to collect wages from Empire. Based upon the foregoing reasons, Empire's Motion for Summary Judgment is **GRANTED** and Plaintiffs' Motion for Summary Judgment is **DENIED**.

IT IS SO ORDERED.